**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FRANK D. LAZZERINI, M.D.,**<br>C/O J. Michael Murray<br>Berkman, Gordon Murray & Devan<br>55 Public Sq. Ste. 2200<br>Cleveland, OH 44113<br><br>Petitioner,<br><br>v.<br><br><br>**KENNETH BLACK,**<br>Warden, Richland Correctional Institution<br>1001 Olivesburg Road<br>Mansfield, OH 44905<br><br>Respondent. | ) | CASE NO.<br><br>JUDGE<br><br>MAGISTRATE JUDGE:<br><br>**PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 AND ALL OTHER APPLICABLE STATUTORY PROVISIONS BY A PERSON IN STATE CUSTODY** |

**PRELIMINARY STATEMENT AND PARTIES**

1. Petitioner Frank D. Lazzerini, M.D., petitions this court, pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus on the ground that he is in custody in violation of the Constitution of the United States.

2. Petitioner is currently serving a state prison sentence of 113 years at Richland Correctional Institute, 1001 Olivesburg Road Mansfield, OH 44905, and is in custody pursuant to a judgment in State court for purposes of 28 U.S.C. § 2254.

3. Respondent Kenneth Black is the Warden of Richland Correctional Institute.

## JURISDICTION

4. This Court has jurisdiction over Petitioner's claims because his detention is in violation of the United States Constitution and because he has exhausted all of his state remedies. *See* 28 U.S.C. § 2241(d); 28 U.S.C. § 2254(b)(1)(A).

## RELEVANT FACTS

### PETITIONER'S TRIAL

5. In *State of Ohio v. Frank D. Lazzerini*, Stark County Court of Common Pleas Case No. 2018CR00282, Petitioner, who was a licensed physician board certified in family medicine, was found guilty by a jury on 187 counts of a 272 count indictment returned after a two year investigation of prescription drugs he wrote for patients in his medical practice. Eight counts were dismissed prior to the trial. Petitioner was sentenced to 113 years in prison.

6. The charges were all predicated on the allegation that he dispensed prescriptions for opioids and other controlled substances to patients without a legitimate medical purpose and inconsistent with the usual course of medical practice and treatment of patients.

7. The charges on which Petitioner was tried can be grouped into three categories, which were strung together by a single charge of engaging in a pattern of corrupt activities as set forth in Count 1 of the Indictment.

8. The first category consisted of charges related to Medicaid Fraud. The State's theory was that Petitioner had fraudulently overbilled the Medicaid program by submitting bills that had been "upcoded" for his services, resulting in higher reimbursement than he was entitled to receive. The Medicaid fraud claims were contained in Count 2 (Telecommunications Fraud), Count 3 (Grand Theft), Count 4 (Medicaid Fraud), and Count 5 (Tampering With Records).

9. The second category of charges related to drug trafficking, which comprised 258 counts of the indictment. After the seizure of thousands of patients' medical records during the execution of a search warrant, the State sent approximately fifty patient files to a medical expert specializing in internal medicine and addiction, Dr. Theodore Parran, to review. Tr. Vol. 8 at 155. He concluded that in connection with forty-five of those patients, Petitioner wrote prescriptions for controlled substances without a legitimate medical purpose and inconsistent with the usual course of medical practice and treatment of patients. The specific charges consisted of 86 counts of aggravated trafficking in drugs, 86 counts of trafficking in drugs and 86 counts of illegal processing of drug documents.

10. Finally, one count charged Petitioner with involuntary manslaughter. That charge, set forth in Count 162, alleged that one of Petitioner's patients, who he had recently dismissed from his practice for noncompliance with her prescription regimen, died of an overdose with prescription drugs written by Petitioner in her system.

11. The matter proceeded to a jury trial on May 8, 2019. During jury selection, over objection that it violated his constitutional right to be present at all critical stages of trial, Petitioner was excluded from individual voir dire of fifty-three prospective jurors on sensitive and substantive topics, conducted in the jury room, spanning parts of two days.

12. The evidentiary portion of the trial commenced on May 9, 2019. The central theme advanced by the prosecution was that Petitioner was running a "pill mill" out of his medical office. The trial lasted five weeks. The state called 38 witnesses and the defense called 18 witnesses and thousands of pages of medical records were introduced into evidence. According to the trial court, it was the longest criminal trial ever in the Stark County Court of Common Pleas and the longest a

jury had ever deliberated in a case. Tr. Vol. 20 at 155.

13. Of the 264 charges that went to the jury, Petitioner was found guilty of 187 counts and not guilty of 76 counts. One count was ultimately dismissed by the state after the verdict.

14. Petitioner was convicted of violating: R.C. 2923.32(A)(1) (Engaging in a Pattern of Corrupt Activity); R.C. 2913.05(A) (Telecommunications Fraud); R.C. 2913.02(A)(1)(2)(3) (Grand Theft); R.C. 2913.40(B) (Medicaid Fraud); R.C. 2913.42(A)(1)(2)(B)(4) (Tampering with Records); R.C. 2925.03(A)(1)(C)(1)(f) and R.C. 2941.1410 (Aggravated Trafficking in Drugs with Major Drug Offender Specifications); R.C. 2925.03(A)(1)(C)(1)(a) (Aggravated Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(1)(c) (Aggravated Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(1)(d) (Aggravated Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(1)(e) (Aggravated Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(2)(a) (Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(2)(c) (Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(2)(d) (Trafficking in Drugs); R.C. 2925.03(A)(1)(C)(2)(e) (Trafficking in Drugs); R.C. 2925.23(A),(B)(1)(f)(1) (Illegal Processing of Drug Documents); R.C. 2925.23(A),(B)(1)(f)(2) (Illegal Processing of Drug Documents); and, R.C. 2903.04(A) (Involuntary Manslaughter).

15. On August 22, 2019, the trial court sentenced Petitioner to an aggregate term of 113 years imprisonment. The aggregate sentence was a result of the trial court ordering that many of the individual sentences be served consecutively.

## PETITIONER'S ARGUMENTS IN THE COURT OF APPEALS

16. Petitioner appealed to the Ohio Court of Appeals for the Fifth Appellate District, in Case No. 2019CA000142, raising numerous assignments of error concerning the denial of Petitioner's constitutional rights.

17. Relevant here, Petitioner's First Assignment of Error in the Court of Appeals set forth that excluding him from individual voir dire violated his constitutional right to be present at every critical stage of the proceedings. He argued that this violation was structural error and, in the alternative, that it was not harmless error.

18. Petitioner's Third Assignment of Error set forth that the trial court's sentence was unconstitutional under the Eighth Amendment and he also argued that the sentence impermissibly punished him for exercising his right to trial.

19. Petitioner's Fourth Assignment of Error set forth that the verdicts were unsupported by the evidence. Petitioner specifically argued that a rational trier of fact could not have found all the essential elements of the crime to have been proven beyond a reasonable doubt.

20. Petitioner's Seventh Assignment of Error set forth that Petitioner was deprived of his constitutional right to effective assistance of counsel. Petition argued, *inter alia*, that his trial counsel was ineffective for failing to object to the jury instructions.

21. On June 11, 2021, the Ohio Court of Appeals for the Fifth Appellate District issued a decision on the merits of those arguments and affirmed Petitioner's conviction and sentence. *See State of Ohio v. Frank D. Lazzerini*, No. 2019CA000142, 173 N.E. 3d 907 (Ohio Ct. App. 5th Dist. 2021).

**PROCEEDINGS IN THE OHIO SUPREME COURT AND THE SUPREME COURT OF THE UNITED STATES**

22. Petitioner then exercised his right of appeal to the Ohio Supreme Court. *See* Ohio Const. Art. IV §2(a)(iii). More specifically, Petitioner filed a notice of appeal and a memorandum in support of jurisdiction in the Ohio Supreme Court in *State of Ohio v. Frank D. Lazzerini*, Case

No. 2021-0918. In his memorandum in support of jurisdiction, he raised five propositions of law.

23. In his first proposition of law, Petitioner asserted that a criminal defendant's due process rights under the United States Constitution is violated when the defendant is denied the right to be present and meaningfully participate in critical portions of voir dire and that violation is structural error and reversible error per se. Petitioner also argued, in the alternative, that the denial of that right was not harmless error.

24. In his third proposition of law, Petitioner submitted that his right to due process of law was violated because the State's evidence against him was insufficient to prove its case beyond a reasonable doubt.

25. In his fourth proposition of law, Petitioner submitted that his trial counsel was constitutionally ineffective for, *inter alia*, failing to object to the jury instructions.

26. In his fifth proposition of law, Petitioner submitted that his sentence was unconstitutional under the Eighth Amendment to the United States Constitution and violated his constitutional right to Due Process of law because it was punishment for exercising his right to trial.

27. On September 28, 2021, the Ohio Supreme Court declined to accept Petitioner's appeal, pursuant to Ohio Supreme Court Rule 7.08(B)(4). Although four of the seven justices dissented and voted to accept the case on certain propositions of law, they could not reach a majority as to which of the five propositions of law to accept for review. Three of the justices (Fischer, J., Stewart, J., Brunner, J.) voted to accept the case on the first proposition of law. *Id.* On December 22, 2021, the Ohio Supreme Court denied reconsideration of its decision on the first proposition of law dismissing the appeal, over the dissent of a different group of three justices (Donnelly, J., Stewart, J., Brunner, J.).

28. On March 16, 2022, Petitioner filed a petition for a writ of certiorari in the Supreme Court of the United States on the question of whether his exclusion from individual voir dire proceedings violated his constitutional right to be present during all critical stages of proceedings.

29. On May 2, 2022, the Supreme Court of the United States denied Petitioner a writ of certiorari. *See* Frank D. Lazzerini v. Ohio, Supreme Court of the United States Docket No. 21-1273.

30. Petitioner has exhausted his state court remedies and now timely brings this petition pursuant to 28 U.S.C. § 2254. Other than the direct appeals listed above, he has not filed any other actions challenging his conviction and sentence.

**GROUND ONE FOR RELIEF:**

**PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT EVERY CRITICAL STAGE OF HIS TRIAL WHEN HE WAS EXCLUDED FROM INDIVIDUAL VOIR DIRE PROCEEDINGS.**

31. Due to the complex nature of the case, the substantial pretrial publicity that it had generated, the publicity about the opioid epidemic then constantly in the news, and the anticipated length of the trial, 139 jurors were summoned and 122 appeared. When they arrived on the morning of trial, each juror was given a 12 page questionnaire to complete. Among other questions, jurors were asked to provide information regarding their attitudes about the prescribing of opiates, whether they knew anyone who used prescribed opiates, whether they knew anyone who was addicted to opiates, whether they knew anyone who had died as a result of opiates, and whether they had read or heard about the case.

32. After the parties were given time to review the questionnaires, the trial court conducted a brief general voir dire of the entire jury panel. The court began by outlining the charges and stated that Petitioner was accused of prescribing opioids to his patients without a legitimate

medical purpose and that he caused the death of one of his patients. Tr. Vol I at 85. In response, various jurors expressed general concerns over the opioid problem and their belief that doctors are overprescribing opioid medications. Tr. Vol I at 99.

33. The Court then explained that, given the nature of the case, individual voir dire of those jurors would be conducted in the jury deliberation room:

> I understand that this case involves some sensitive issues, it involves some sensitive feelings, and I don't want – really want to put anybody on the spot, making you have to talk about it in front of a roomful of strangers.
>
> So what we are going to do is the attorneys and myself, along with [the court reporter], are going to go back in this room back here, which is the jury deliberating room. We're going to call you back one by one, for those of you who have an answer that we'd like to explore a little bit further, and just ask you some questions.
>
> It's not like being called into the principal's office, you're not in any trouble. Actually, we appreciate the fact that you have explained that to us. I do want to say, though, that this will take some time and we will need to go through this. You are free to stand and stretch, talk to your neighbor, talk about the Indians, whatever you want to talk about, make a new friend. Again, you will be permitted to leave the courtroom to use the restroom on this floor, if you need to.
>
> Just I do ask for your patience. I understand that this is a little bit frustrating and it is long, but it is necessary. Okay.

Tr. Vol. 1 at 100-01.

34. Before individual voir dire proceedings began in the jury deliberation room, the court informed counsel that Petitioner would be excluded from those proceedings. Petitioner's counsel immediately objected on the ground that Dr. Lazzerini had a right to be present during individual voir dire because it was a critical stage in the proceedings. Tr. Vol. 1 at 101-02. The court overruled the objection for no other reason than its characterization of individual voir dire proceedings as being "no different" from a sidebar conference. *Id.* at 103.

35. The Judge, bailiff, court reporter, three prosecutors, and Petitioner's two attorneys were present in the jury deliberation room while jurors were called in one by one for questioning. Petitioner, who since his arrest had been in custody due to his inability to post the $5,000,000 cash or surety bond that had been set, was left seated in the courtroom under the watchful eyes of the courtroom bailiffs and in the presence of the other jurors who chose to remain.

36. On this first day, thirty-six jurors were questioned individually over the course of two-and-a-half hours. The individual questioning of the jurors delved into numerous substantive areas but often centered on issues surrounding pretrial publicity, knowledge of witnesses, potential biases, predispositions, hardships, and opiate abuse. The following examples are illustrative.

37. Juror Number 385 disclosed that some of the pharmacy technicians that were named as witnesses in the case were patients of the dental office in which she worked. Tr. Vol I at 112-113. Juror Number 385 returned to the general pool and was ultimately seated as a juror in the trial.

38. Juror Number 403 was summoned into the jury deliberation room for individual questioning after responding in her questionnaire that she learned about the case in the newspapers and that she thought that opiates may be overprescribed based on what she had seen in the media. Upon questioning, she explained that while she thought it was not polite to form an opinion based on something you read in the newspapers, she thought that the story about the allegations against Petitioner did not sound good. Jury Number 403 returned to the general pool and was ultimately seated as a juror in the trial. Tr. Vol. 1 at 125-129.

39. Juror Number 409 disclosed that his wife started to take pain killers after her surgery and that his grandson went to prison for addiction after he conned his doctor into giving him prescriptions. Tr. Vol. 1 at 134-136. When defense counsel asked whether his knowledge of his

grandson's experience would affect his ability to be impartial, he responded that he highly doubted that it would because "people are going to lie to get what they want." Tr. Vol. 1 at 138. Juror Number 409 returned to the general pool and was ultimately seated as a juror in the trial.

40. Juror Number 445 raised concern about knowing a potential witness from years ago. Tr. Vol. 1 at 162-163. Juror Number 464 stated during individual questioning that his father-in-law takes opiates for chronic pain and that he had previously served on a grand jury for three months and was familiar with the prosecutor. Tr. Vol. 1 at 178-183. Both Jurors returned to the general pool and were ultimately seated as jurors in the trial.

41. Juror Number 471 explained that he had heard about the case in the newspaper and his mother takes opiates in her nursing home to deal with the pain associated with neck surgery. Tr. Vol. 1. at 183-187. Juror Number 541 discussed the fact that he was unsure of whether he would get paid by his employer but still expressed a strong willingness to serve for the experience. Tr. Vol 1. at 258-260. Both Jurors returned to the general pool and were ultimately seated as jurors in the trial.

42. Juror Number 437 was a nurse for over thirty years. In that role, she explained that she had seen first-hand people become addicted to pain medication and she had problems with doctors violating their Hippocratic oath. She also stated that her brother died of a drug overdose but, although she had no proof, she suspected that foul play was involved and that someone had managed to overdose him. Defense counsel also questioned her about her role in dispensing medication and she discussed the fact that if she makes one mistake she can lose her license because the controls are so tight. Tr. Vol. 1 at 153-157. She concluded the questioning by stating that this would be a very hard case for her but that she wanted "to do the right thing really." Tr. Vol. 1 at 158. She was

removed for cause on motion of the defense. *Id.*

43. Juror Number 519 had stated on her questionnaire that she had family members who took opioids for pain management. Upon individual questioning, she stated that she could see potential bias "on either side of the case" because she was familiar with the fact that doctors have a very difficult job in treating people with chronic pain and yet there are cases of opioid abuse where patients became addicted to the medication and died. Tr. Vol. 1 at 200-203. Defense counsel asked her "who do you think is to blame for the problem with opiates?" She responded:

> Again, I think most cases it comes down to the individual that is taking it, you know. I think sometimes the doctor is trying to do what's in the best interest but every case is different, but I think sometimes in the hands of people that are in pain or desperate, they can misuse those to try help get out of the pain, I guess is the best I can say.

Tr. Vol 1 at 204-05.

44. Juror Number 519 further stated that her son had a chronic condition and that it would be difficult to be away from him but it would not be impossible and would only be somewhat of a distraction if she were seated. Tr. Vol 1 at 207-08. She was then removed for cause on defense counsel's motion. *Id*.

45. Juror Number 525 was also individually questioned after disclosing that she had read an article about the case on Facebook as well as some general information about opioid addiction. Defense counsel asked who she thought was to blame for the opioid problem. She responded, "The people themselves – I don't blame the doctor because I had heart surgery and I refused to take what I didn't need. I would take Tylenol before I would take a strong pain pill. So I believe the people themselves are getting addicted to it too easily." Tr. Vol. 1 at 239. Defense counsel proceeded to ask if she had to vote at that moment what would her verdict be? She replied that she would say guilty

based on what she read and then the defense moved to remove her for cause. Tr. Vol. 1 at 240. The court denied the motion and she returned to the jury pool. *Id.*

46. Juror Number 523 brought up during individual questioning that he was a high school teacher and saw first-hand that prescription pills are a problem. He indicated he was bothered by the sheer number of counts in the case because "my kids are getting this from somewhere." Tr. Vol. 1 at 216-217. The judge denied the defense's motion to remove Juror Number 523 for cause. Tr. Vol. 1 at 222.

47. Juror Number 540 echoed Juror Number 523's concern over the number of counts involved in the case and felt that with that many charges the Petitioner's "guilty of something." Tr. Vol. 1 at 256. Juror Number 540 was removed for cause. Tr. Vol. 1 at 258.

48. Juror Number 525 stated during her individual questioning that she read about the case in the news and that she "knew [Petitioner] was giving out too many drugs." Tr. Vol. 1 at 236. She thought overprescribing of prescription medications was a significant problem in the community. Tr. Vol. 1 at 239. When asked whether she had any preconceived notions about whether the Petitioner committed the crimes for which he had been charged, she stated that she would try and keep an open mind throughout the trial but right now she would say he's guilty. Tr. Vol. 1. at 240. The judge denied the defense's motion to remove her for cause. Tr. Vol. 1 at 241.

49. The next morning, prior to the resumption of the individual voir dire questioning, defense counsel moved for a mistrial. Tr. Vol. 2 at 5-15. Counsel cited case law for the proposition that a criminal defendant has a constitutional right to be present during this critical stage of the case and then identified several reasons why Petitioner's absence was prejudicial. First, some of the individuals questioned knew some of the witnesses who were going to testify at trial, including

witnesses Dr. Lazzerini knew well, and it was important for him to hear firsthand the potential jurors' perceptions of those witnesses. Tr. Vol. 2 at 10-12. Second, several prospective jurors had family members or friends who struggled with opiate addiction, and it was important for Dr. Lazzerini to hear their opinions about prescribing opioids. Tr. Vol. 2 at 12-13. Third, some of the prospective jurors had experience in the medical field and described how they were affected by the rules, regulations, and protocols, regarding prescriptive opiate practices. Counsel further noted that as a physician, Dr. Lazzerini possessed specific knowledge, training and experience that could have significantly contributed to his counsel's ability to inquire into jurors who had experience with opioids as well as with those who had backgrounds in medicine. Tr. Vol. 2 at 13-14. Fourth, Dr. Lazzerini's seclusion from the process sent a prejudicial message to the jurors in the courtroom present with him that he could not be trusted hearing what the jurors had to say and that he was not actively participating in his defense. Tr. Vol. 2 at 14-15. Finally, defense counsel noted that the opportunity for Dr. Lazzerini to observe the demeanor of jurors and hearing their precise answers during individual questioning was lost forever and no amount of questioning during the general voir dire could recreate what happened in his absence. Tr. Vol. 2 at 20-22.

50. Nevertheless, the trial court denied the motion for mistrial. Tr. Vol. 2 at 29. Counsel then requested that moving forward with the remaining individual voir dire, Petitioner be permitted to be present and participate with his counsel. The trial court denied that request as well. *Id.*

51. An additional seventeen jurors were examined individually on day two. The nature of the questioning was similar to what had occurred on day one. While the court and counsel questioned potential jurors, Petitioner sat alone at the defense table in the courtroom in front of the rest of the jury pool.

52. In total, the record reveals that fifty-three potential jurors were called into the jury room and questioned outside of Dr. Lazzerini's presence for nearly four hours, over a two-day period. The transcript from those proceedings constitutes 226 pages of the record. (Tr. Vol. 1 pages 105-260; Tr. Vol. 2 pages 32-103).[1]

53. Thereafter, the court and the parties conducted a general voir dire in open court in the presence of Dr. Lazzerini. The court explained to the jury "we are going to now move along a little bit more quickly." Tr. Vol. 2 at 121. Indeed, the general voir dire conducted after the individual voir dire took approximately three hours to complete before the jury was sworn-in and covered 161 pages of transcript (Tr. Vol. 2 at 121-282).[2] **Thus, Petitioner was excluded from a majority of the voir dire at his trial**.

54. Of the fifty-three jurors who were questioned outside of Petitioner's presence, six were selected as jurors and two more were selected as alternates. Tr. Vol. 21 at 178-183; Tr. Vol. 1 at 183; Tr. Vol. 1 at 162; Tr. Vol 1. at 132; Tr. Vol 1 at 134; Tr. Vol 1 at 111; Tr. Vol. 1 at 178; Tr. Vol. at 124; Tr. Vol. at 258. One of those alternates eventually took the seat of a juror who had also been questioned individually and needed to be excused. Tr. Vol. 12 at 26; Thus, eight jurors who were questioned outside of Petitioner's presence were empaneled and six of those jurors decided his case. One of those jurors was ultimately selected foreperson. Another of those jurors, while the court was in the middle of reading its instructions and explaining the verdict forms near the close of the trial, asked the court “there’s twelve minds up here...what happens when we cannot

---

[1] Petitioner, of course, had no input as to the jurors who were dismissed for cause during the individual *voir dire* proceedings.

[2] The court’s general voir dire conducted prior to individual voir only constituted 46 pages of transcript (Tr. Vol. 1. at 54-100).

agree?" Tr. Vol. 20 at 43.

55. Petitioner argued to the Ohio Court of Appeals and the Ohio Supreme Court, as well as the United States Supreme Court in his petition for a writ of certiorari, that his exclusion from individual voir dire violated his constitutional right to due process of law and was structural error and, alternatively, that it was not harmless error.

56. The Ohio Court of Appeals agreed it was error and violated Petitioner's constitutional rights to exclude him from the deliberation room during the individual voir dire. However, it concluded that it did not amount to structural error and was subject to harmless error analysis. It then found that the error was harmless. In so doing, it placed the burden on Petitioner to point to specific portions of the record to demonstrate the harm that he suffered from his absence.

57. The Ohio Court of Appeals decision denying relief on this ground was contrary to and/or involved an unreasonable application of the Supreme Court's precedent including, but not limited to, *Hopt v. Utah*, 110 U.S. 574 (1884); *Lewis v. United States*, 146 U.S. 370 (1892); *Diaz v. United States*, 223 U.S. 442 (1912); *Chapman v. California*, 368 U.S. 18, 23 (1967); and, *Gomez v. United States,* 490 U.S. 858 (1989).

58. The Ohio Court of Appeals decision denying relief on this ground was also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

59. The Ohio Supreme Court declined to accept Petitioner's appeal, pursuant to Ohio Supreme Court Rule 7.08(B)(4).

60. Petitioner's exclusion from individual voir dire proceedings violated his constitutional right to be present during all critical stages of the proceedings and as a result, his custody is in

violation of the Sixth and Fourteenth Amendments to the United States Constitution and his Petition for a writ of habeas corpus should be granted.

**GROUND TWO FOR RELIEF:**

**PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS ATTORNEYS FAILED TO OBJECT TO PREJUDICIAL JURY INSTRUCTIONS.**

61. The underlying controlled substances statutes that Petitioner was charged with violating, R.C. 2925.03(A) (aggravated trafficking of drugs and trafficking of drugs) and R.C. 2925.23 (illegal processing of drug documents), contain specific exemptions for licensed physicians.

62. Ohio Rev. Code. 2925.03(A)(1) states that "No person shall knowingly...Sell or offer to sell a controlled substance or a controlled substance analog." However, subsection (B)(1) then provides that "this section does not apply to....[m]anufacturers, licensed health professionals authorized to prescribe drugs, pharmacists, owners of pharmacies, and other persons whose conduct is in accordance with Chapters 3719., 4715., 4723., 4729., 4730., 4731., and 4741. of the Revised Code."

63. Similarly, R.C. 2925.23 provides that "no person shall knowingly make a false statement in any prescription, order, report, or record required by Chapter 3719. or 4729. of the Revised Code." Subsection (E) then provides, in relevant part, "this section does not apply to licensed health professionals authorized to prescribe drugs, pharmacists, owners of pharmacies, and other persons whose conduct is in accordance with Chapters 3719., 4715., 4723., 4725., 4729., 4730., 4731., and 4741. of the Revised Code."

64. The inapplicability of the exemption for licensed physicians is an element of the

offense that the state must prove beyond a reasonable doubt. *See State v. Nucklos*, 121 Ohio St. 3d 332, paragraph one at syllabus (2009) ("To convict a licensed health care professional of trafficking in drugs under R.C. 2925.03(A), the state bears the burden of proving beyond a reasonable doubt the inapplicability of the licensed-health-professional exception in R.C. 2925.03(B)(1) by submitting evidence that the licensed health professional violated statutes or regulations that define the standard of care for dispensing controlled substances."); *see also Ruan v. United States*, 142 S.Ct. 2370 (2022) (interpreting federal Controlled Substances Act so that in a prosecution involving a physician, the government must prove beyond a reasonable doubt that the physician knowingly or intentionally prescribed in an unauthorized manner).

65. With respect to licensed physicians, Ohio Rev Code R.C. 4731.052(B) authorizes the Ohio Medical Board to adopt the standards for prescribing medication. R.C. 3719.06(A)(1) also provides that a health care professional may prescribe a controlled substance in accordance with the rules adopted by the state board. The standards and rules, in effect during the period in which Petitioner was charged, were found in Ohio Adm. Code 4731-21-02, which defined the standard of care for prescribing medications.

66. However, the state's theory of the case was not that Petitioner violated any of these specific provisions. Instead, the state tried its case on a more expansive basis for criminal liability and submitted that Petitioner authorized prescriptions to his patients for "other than legitimate medical purposes and inconsistent with the usual course of practice," based on a 1984 decision from the Ohio Supreme Court. *See State v. Sway*, 15 Ohio St.3d 112 (1984).

67. In *Sway*, a physician "prescribed" controlled substances to a woman in return for sex. The defendant was charged with trafficking in drugs and he moved to dismiss the indictment on

grounds that his conduct was not prohibited by statute. The trial court granted the motion and the court of appeals affirmed that ruling. The Ohio Supreme Court reversed and held that a defendant could not hide behind the fact that he was a physician to avoid prosecution under R.C. 2925.03. The *quid pro quo* arrangement in that case made it "patently clear" to the court that he "departed from the minimal standards of his profession when he unlawfully prescribed the illicit drugs in question." 15 Ohio St. 3d at 114. Thus, the court held that, "a physician who unlawfully issues a prescription for a controlled substance not in the course of the bona fide treatment of a patient is guilty of selling a controlled substance in violation of R.C. 2925.03" and that the prosecution could move forward. *Id*. at 117.

68. But in 2009, the Ohio Supreme Court made clear in *State v. Nucklos*, *supra*, that "the state bears the burden of proving beyond a reasonable doubt the inapplicability of the licensed-health-professional exception in R.C. 2925.03(B)(1), by submitting evidence that the licensed health professional **violated statutes or regulations that define the standard of care** for dispensing controlled substances." *Id.* at 336 (emphasis added). The court went on to explain how the state could meet its burden in that regard:

> R.C. 4731.052(B) provides that the state medical board shall adopt rules that establish standards and procedures to be followed by physicians regarding the treatment of intractable pain, including standards for prescribing dangerous drugs. One of those rules is Ohio Adm.Code 4731–21–02, which defines the standard of care for prescribing prescription drugs to patients who have intractable pain. In regulating treatment of such patients, Ohio Adm.Code 4731–21–02 requires a physician to extensively document a patient's evaluation, diagnosis, and individualized treatment plan. Therefore, compliance or noncompliance with Ohio Adm.Code 4731–21–02 can be established by proper documentation, or lack thereof. ***

*Id.* at ¶16.

69. The *Nucklos* Court then noted that to make its case, the prosecution had offered expert testimony that the physician's records were insufficient under those regulations. *Id.* at ¶17. However, the Ohio Supreme Court affirmed the court of appeals' decision reversing the defendant's conviction because the trial court improperly instructed the jury that regulatory compliance was an affirmative defense. *Id.* at ¶23.

70. The Ohio pattern jury instructions, which were also in effect at the time of Petitioner's trial, are consistent with *State v. Nucklos*. Those instructions provide that, *inter alia*, the state must prove beyond a reasonable doubt that:

> the defendant, at the time of the offense, was a licensed health professional authorized to prescribe drugs...whose conduct was not in compliance with (describe applicable standards and/or procedures **as specified by statute or regulation**).

OJI CR 525.03. (emphasis added).

71. However, the trial court never instructed on what specific laws or regulations Petitioner was accused of violating. Instead, the trial court included the following general instruction for each of those counts:

> Accordingly, for every count of aggravated drug trafficking in drugs, trafficking in drugs, illegal processing of drug documents, and involuntary manslaughter, the State must also prove beyond a reasonable doubt that the defendant, Frank Lazzerini, acting alone and/or in association with Premier Family Practice and/or Frank D. Lazzerini, M.D., LLC, authorized prescriptions for a controlled substance for other than legitimate medical purposes and inconsistent with the usual course of medical practice and treatment of patients under the laws regulating a physician's practice.

Tr. Vol. 19 at p. 87.

72. The trial court also included the following instruction defining "Other than legitimate medical purposes and inconsistent with the usual course of medical practice and treatment of patients under the laws regulating a physician's practice":

> In order to determine if a controlled substance was prescribed or dispensed other than for legitimate medical purposes and inconsistent with the usual course of medical practice and treatment of patients under the laws regulation a physician's practice, you must consider the laws regulating a physician's practice, you must consider the defendant's subjective state of mind. In doing so, you must consider whether the defendant's actions were performed in the course of the bona fide treatment of the patient.
>
> Bona Fide means in or with good faith; honestly, openly and sincerely, without deceit or fraud.

Tr. Vol. 19 at 44.

73. In addition, the trial court instructed the jury that the State was only required to prove that Petitioner *knowingly* sold or offered to sell a controlled substance or made a false statement in a prescription. It failed to specifically instruct the jury that the State was also required to prove that Petitioner *knowingly* did so in a manner that was unauthorized under Chapter 4731 or Chapter 3719 of the Revised Code, or even that he *knowingly* did so for other than a legitimate medical purpose and inconsistent with the usual course of practice. *See, e.g., Ruan v. United States*, 142 S.Ct. 2370 (2022) (concluding under similar federal statute that regulatory language defining an authorized prescription is ambiguous and a "strong scienter requirement" was necessary in prosecution of physicians charged with unauthorized distribution of opioids.)

74. Thus, the theory of prosecution permitted Petitioner to be convicted on the basis of criticism of how he practiced medicine and without precise proof or jury instructions that he engaged in criminal conduct by knowingly violating a regulation in prescribing controlled substances. *See e.g., Ruan v. United States*, 142 S.Ct. 2370, 2389 (2022) (Alito, J. concurring) ("But acting 'as a physician' does not invariably mean acting as a good physician, as an objective understanding of the 'in the course of professional practice' standard would suggest. A doctor who makes negligent or

even reckless mistakes in prescribing drugs is still 'acting as a doctor'— he or she is simply acting as a bad doctor. The same cannot be said, however, when a doctor knowingly or purposefully issues a prescription to facilitate 'addiction and recreational abuse.' Objectives of that kind are alien to medical practice, and a doctor who prescribes drugs for those purposes is not 'acting as a physician' in any meaningful sense.") (internal citations omitted).

75. However, Petitioner's trial counsel did not object to the state's theory of the case and trial court's instruction. Nor did Petitioner's counsel submit that the Ohio pattern instruction be used or offer their own instructions in this regard.

76. The failure of Petitioner's trial counsel to object to these instructions fell below the objective standard of reasonableness and but-for trial counsel's failure, there is a reasonable probability that the result of the proceeding would have been different, meaning sufficient probability to undermine confidence in the outcome, and deprived Petitioner of his Sixth and Fourteenth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984).

77. Petitioner argued to the Ohio Court of Appeals and the Ohio Supreme Court that his trial counsel was ineffective for failing to object to prejudicial jury instructions regarding the physician's standard of care. The Court of Appeals held that Petitioner did not "demonstrate a reasonable probability of a change in the outcome had counsel objected." *State v. Lazzerini*, 173 N.E.3d 907 at ¶127 (Ohio Ct. App. 5th Dist. 2021).

78. The Ohio Court of Appeals' decision denying relief on this ground was contrary to and/or involved an unreasonable application of Supreme Court precedent including but not limited to *Strickland v. Washington*, 466 U.S. 668 (1984).

79. The Ohio Court of Appeals decision denying relief on this ground was also based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

80. The Ohio Supreme Court declined to accept Petitioner's appeal, pursuant to Ohio Supreme Court Rule 7.08(B)(4), finding no substantial constitutional issue and dismissed it.

81. As a result of Petitioner's trial counsel's failure to object to these erroneous and prejudicial jury instructions, his custody is in violation of the Sixth and Fourteenth Amendments to the United States Constitution and his Petition for a writ of habeas corpus should be granted.

**GROUND THREE FOR RELIEF:**

**PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT PETITIONER'S CONVICTIONS BEYOND A REASONABLE DOUBT.**

82. Petitioner's convictions were predicated on the testimony from the State's expert witness that Petitioner was writing prescriptions to certain patients, without a legitimate medical purpose and inconsistent with the usual course of medical practice and treatment of patients.

83. Even under that standard, the state failed to prove its case beyond a reasonable doubt as the evidence introduced at trial demonstrated that Petitioner was prescribing medications during the course of treating his patients and their various underlying pain and illnesses.

84. The state's expert, Dr. Parran, admitted during his testimony that pain is subjective and that reasonable medical professionals can and often do disagree on how to treat pain. Tr. Vol 10, p. 222-225. Indeed, Petitioner's expert, Dr. Adam Carinci, who is board certified in both anesthesia and pain management and pain medicine, testified that in his expert opinion, all of the prescriptions written by Petitioner were justified under the standard used by Dr. Parran. Tr. Vol. 16 at p. 20, 30-

208.

85. Dr. Carinci also explained that in a "pill mill" scenario a patient merely sees the doctor, the doctor prescribed opioids, the patient gets the drugs and then the doctor gets compensated. Tr. Vol. 16 at p. 92. Thus, in a pill mill there's no actual medical care being pursued, the function of the practice is simple to dispense controlled substances for profit. Tr. Vol. 16 at 209. That is not what transpired in Petitioner's medical practice. Petitioner treated patients with multiple agents and multimodal treatments, managed medical issues aside from pain, did diagnostic work-ups, referred patients to specialists, ordered labwork, X-ray studies and different therapies, and performed and documented medical histories, physical examinations and assessments of pain. Tr. Vol. 16 at 93, 210, 213, 216.

86. Dr. Parran also conceded that many of Petitioner's procedures, including the use of the Ohio Automatic Rx Reporting System (OARRS) and urine drug screening were "good practice." Tr. Vol. 10 at 228. Furthermore, he acknowledged Petitioner conducted follow up visits for patients, sent them for referrals to other medical providers and indicated in the chart how patients were responding to the medication. *See e.g.*, Tr. Vol. 10 at 233-235.

87. Moreover, notwithstanding the state's theory that Petitioner prescribed controlled substances without a "legitimate medical purpose and inconsistent with the usual course of medical practice and treatment of patients," the State did not specify what regulations it contended Petitioner had violated as to each patient, which was a necessary element to prove its case beyond a reasonable doubt under R.C. 2925.03 and R.C. 2925.23. *See State v. Nucklos, supra*.

88. Thus, the evidence in support of Petitioner's state convictions for aggravated drug trafficking, drug trafficking, illegal processing of drug documents cannot be fairly characterized as

sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt and his convictions are in violation of his constitutional right to due process of law.

89. In addition, because no rational trier of fact could have found the state proved beyond a reasonable doubt that Petitioner committed or was attempting to commit the underlying drug trafficking offenses, the evidence in connection with involuntary manslaughter was also insufficient. Ohio's involuntary manslaughter statutes provides, "No person shall cause the death of another or the unlawful termination of another's pregnancy *as a proximate result of the offender's committing or attempting to commit a felony*." (emphasis added). In the Indictment, the State charged drug trafficking offenses as the predicate felony offenses for the involuntary manslaughter charge in Count 162.

90. Separate and apart from that fact, the State also failed to prove beyond a reasonable doubt that prescriptions written by Petitioner were the but-for cause of the patient's death in connection with the involuntary manslaughter charge in Count 162 of the Indictment.

91. Thus, no rational trier of fact could find that the state proved beyond a reasonable doubt that Petitioner was guilty of involuntary manslaughter as charged.

92. Petitioner argued to the Ohio Court of Appeals and the Ohio Supreme Court that his convictions on these charges were based on insufficient evidence in violation of his constitutional right to due process of law.

93. The Ohio Court of Appeals decision denying Petitioner relief on this ground was contrary to and/or involved an unreasonable application of Supreme Court precedent including but not limited to *In re Winship*, 397 U.S. 358 (1970) and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

94. The Ohio Court of Appeals decision denying Petitioner relief on this ground was also based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

95. The Ohio Court of Appeals decision denying relief on this ground was also objectively unreasonable.

96. The Ohio Supreme Court declined to accept Petitioner's appeal, pursuant to Ohio Supreme Court Rule 7.08(B)(4), finding no substantial constitutional issue and dismissed it.

97. The evidence at trial was insufficient to prove the essential elements of Petitioner's charges beyond a reasonable doubt and as a result, his custody is in violation of Fourteenth Amendment to the United States Constitution and his Petition for a writ of habeas corpus should be granted.[3]

**GROUND FOUR FOR RELIEF:**

**PETITIONER'S SENTENCE OF 113 YEARS IMPRISONMENTCONSTITUTES CRUEL AND UNUSUAL PUNISHMENT**

98. The trial court sentenced Petitioner to a total term of imprisonment of 113 years.

99. The 113 year sentence based on Petitioner's conduct prescribing medication to patients in his medical practice shocks the conscience and is egregiously disproportionate to the offenses on which the jury returned a guilty verdict.

100. The record notes that the State offered to Petitioner a sentence of 27 years imprisonment if he pleaded guilty to the full 272 count Indictment. Nevertheless, after being acquitted of 1/3 of those charges at trial, the trial court imposed a sentence of 113 years

[3] Pursuant to 28 U.S.C. 2254(f), Petitioner is filing copies of his trial transcript separately.

imprisonment on Petitioner. Thus, the 113 year sentence not only amounts to cruel and usual punishment but was also a penalty imposed for Petitioner exercising his right to trial.

101. Petitioner argued to the Ohio Court of Appeals and the Ohio Supreme Court that his sentence amounted to cruel and unusual punishment in violation of the Eighth Amendment and also violated his right to due process of law because he received such a severe penalty for exercising his right to trial.

102. The Ohio Court of Appeals' decision denying relief on this ground as contrary to and/or involved an unreasonable application of the Supreme Court's precedent including but not limited to *Graham v. Florida*, 560 U.S. 48 (2010) and *Solem v. Helm,* 463 U.S. 277 (1983).

103. The Ohio Court of Appeals decision denying relief on this ground was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

104. The Ohio Supreme Court declined to accept Petitioner's appeal, pursuant to Ohio Supreme Court Rule 7.08(B)(4), finding no substantial constitutional issue and dismissed it.

105. As a result of the trial court's sentence, Petitioner's custody is in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and his Petition for a writ of habeas corpus should be granted.

**PRAYER FOR RELIEF**

Wherefore, Petitioner prays that this Court:

1. Order that Petitioner's application for a writ of habeas corpus be granted and that his convictions be vacated and set aside.

2. Order that Petitioner be released from custody of Respondent if new proceedings are

not commenced by the state within a prescribed time period.

3. Alternatively, order that Petitioner be re-sentenced by the State court in a manner that is not in violation of his constitutional rights.

4. Order any further relief the Court deems necessary and proper.

Respectfully submitted,

/s/J. Michael Murray

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
WILLIAM C. LIVINGSTON (0089538)
wlivingston@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113-1949
(216) 781-5245
(216) 781-8207 (fax)

Attorneys for Petitioner

I declare under penalty of perjury that the foregoing is true and correct.

FRANK D. LAZZERINI, M.D.

8/15/2022
EXECUTED ON DATE