**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANK D. LAZZERINI, | ) | Case No. 1:22-CV-01481-CEF |
| | ) | |
| Petitioner, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| KENNETH BLACK, WARDEN | ) | ARMSTRONG |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

## I.    INTRODUCTION

Petitioner, Frank D. Lazzerini ("Dr. Lazzerini"), seeks a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1). Dr. Lazzerini was sentenced to 113 years in prison after being convicted of 187 counts, including trafficking in drugs, aggravated trafficking in drugs, illegal processing of drug documents, engaging in a pattern of corrupt activity, involuntary manslaughter, telecommunications fraud, Medicaid fraud, tampering with records, and grand theft.

Dr. Lazzerini asserts four grounds for relief. Respondent, Warden Kenneth Black ("Warden"), filed an answer/return of writ on December 5, 2022. (ECF No. 11). Dr. Lazzerini filed a traverse on March 1, 2023. (ECF No. 16). This matter was referred to me on September 2, 2022 under Local Rule 72.2 to prepare a report and recommendation on Dr. Lazzerini's petition. (*See* ECF non-document entry dated September 2, 2022). For the reasons set forth below, I recommend that Dr. Lazzerini's petition be DISMISSED and/or DENIED. However, I also recommend that the Court GRANT Dr. Lazzerini a certificate of appealability solely with respect to his first ground for relief.

1

## II. RELEVANT FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. The Ohio Court of Appeals for the Fifth Appellate District summarized the facts as follows:

{¶2} Appellant became a licensed physician in Ohio in 2008. He opened Premier Family Practice in Massillon, Ohio, in 2012. Appellant was the sole practitioner at his general family practice. After an investigation into Appellant's medical practice by the Jackson Township Police Department, the Ohio Board of Pharmacy, the Ohio Attorney General's Office, the Ohio Medical Board, and the Drug Enforcement Agency, a search warrant was executed at Premiere Family Practice on February 17, 2016.

{¶3} The investigation revealed Appellant was running what is known as a "pill mill." A pill mill is a term used to describe a doctor, clinic, or pharmacy which prescribes or dispenses powerful narcotics inappropriately or for non-medical purposes. Patients seen by Appellant generally had pain or pain-related complaints and diagnoses, and received "cookie cutter" treatment from Appellant. While Appellant often gave routine and duplicative orders for blood work and x-rays, referrals to chiropractors, physical therapists or pain management specialists, there was little follow up by patients. Appellant often made pre-formatted and pre-signed orders simply to make the medical work record appear complete. Meanwhile, Appellant prescribed multiple controlled substances to his patients. Medical records confirmed Appellant often increased strength and dosage of controlled substances and opioids with little or no medical justification.

{¶4} A review of the Ohio Automated Rx Reporting System (OARRS) revealed between November 22, 2015 and December 22, 2015, Appellant was the second highest prescriber of controlled substance prescription drugs in Ohio, and he was the highest prescriber between December 22, 2015 and January 22, 2016. From March 27, 2013, through September 17, 2015, Appellant wrote or authorized 20,745 controlled substance prescriptions. Appellant prescribed narcotics for patients living as far away as West Virginia.

{¶5} In his medical office, Appellant laughed and made fun of his patients, joking he needed a "Percocet vending machine" and describing his patients as "Perc-Monsters." He saw a significant number of patients each day, often spending less than five minutes with each patient. Appellant forced employees to schedule 70-80 patients a day and threatened to terminate his employees for failing to do so. After returning from a vacation, Appellant saw 131 patients on September 10, 2015, and 103 patients the next day. Appellant rarely provided the required warnings to patients regarding the dangerous nature of prescribed narcotics.

{¶6} Appellant purposely targeted Medicaid patients in order to bill the Ohio Medicaid Program at a high level. Appellant used fraudulent billing to get reimbursed at a much higher rate from Medicaid than he was entitled. He bragged about overbilling Medicaid. According to the State's coding expert for Medicaid, Dr. Daniel Bowerman, Appellant submitted claims based on false records, which the expert termed "nonsense notes." The Medicaid program paid Appellant over $12,000 to which he was not entitled. Further, the amount Medicaid paid for prescriptions written by Appellant which were outside the ordinary course of medical practice and for purposes other than a legitimate medical purpose totaled $58,834.66.

{¶7} Expert review of medical records confirmed Appellant routinely prescribed opioids and benzodiazepines to patients who were very ill with heart failure, morbid obesity, COPD, obstructive sleep apnea, unstable psychiatric conditions, or a combination of these things. His records indicated he frequently increased opioid dosages with little or no documented medical support. He continued prescribing opiates to patients showing out of control behavior, inconsistent toxicology testing, and diverting of medications.

{¶8} Jamie Hayhurst died of a drug overdose on August 12, 2014. Hayhurst was a patient of Appellant's practice. On August 5, 2014, Appellant prescribed a number of opioids and other drugs to Hayhurst, including Percocet, fentanyl, alprazolam, and hydrocodone. Hayhurst failed a urine screen on August 5, because her previously prescribed controlled substances were not in her urine, indicating she had not been taking medications as prescribed. Appellant refilled all of her prescriptions and dismissed her from his practice.

{¶9} After an autopsy, the Stark County Coroner's Office ruled Hayhurst died from acute intoxication caused by the combined effects of multiple drugs including alprazolam, fentanyl, and oxycodone. All medications found in Hayhurst's system were prescribed by Appellant.

(ECF No. 11-1, Exhibit 36); *State v. Lazzerini*, 173 N.E.3d 907, 914-15 (5th Dist. 2021).

## III. PROCEDURAL HISTORY

### A. <u>State Court Conviction</u>

On February 14, 2018, Dr. Lazzerini was indicted in the Stark County Court of Common Pleas on February 14, 2018 on 272 counts, including (1) engaging in a pattern of corrupt activity; (2) telecommunications fraud; (3) grand theft; (4) Medicaid fraud; (5) tampering with records; (6) involuntary manslaughter; (7) aggravated trafficking in drugs; (8) trafficking in drugs; and (9) illegal processing of drug documents. (ECF No. 11-1, Exhibit 1). Certain of the aggravated drug trafficking counts also carried major drug offender specifications. *Id*. On February 28, 2018, Dr. Lazzerini pled not guilty to all charges. (ECF No. 11-1, Exhibit 2).

Both parties filed various pretrial motions, none of which is relevant to the issues in this proceeding. On April 26, 2019, the State filed a motion to amend the indictment to correct certain typographical errors and lower the felony level of several counts. (ECF No. 11-1, Exhibit 27). The State also asked the trial court judge to dismiss eight counts and a major drug offender specification. *Id*. On May 3, 2019, the trial court granted the State's motion. (ECF No. 11-1, Exhibit 28).

The case proceeded to trial. At the beginning of jury selection, prospective jurors filled out a juror questionnaire. (ECF No. 11-1, Exhibit 36, ¶ 13; ECF No. 11-8, PageID # 7902). The trial court then announced that counsel and the court had questions regarding to some jurors' answers to the questionnaire. *Id*. at PageID # 7904. The court also announced that, because some of the questions might touch on sensitive matters, the court would conduct individual voir dire of certain jurors in a separate room. *Id*. at PageID # 7997.

Before the individual voir dire sessions began, Dr. Lazzerini's counsel objected that Dr. Lazzerini was not present, arguing that voir dire was a critical stage of the proceedings

and that Dr. Lazzerini had a right to attend. *Id*. at PageID # 7999. The trial court overruled Dr. Lazzerini's objection, holding that the individual voir dire proceedings were equivalent to a sidebar which, the court believed, Dr. Lazzerini had no right to attend. *Id*. at PageID # 8000.

On the first day of voir dire, the court and counsel questioned jurors individually in proceedings that took approximately two-and-a-half hours. (ECF No. 11-8, PageID # 8002-8157). Before voir dire resumed on the second day, Dr. Lazzerini's counsel renewed their objection to Dr. Lazzerini's exclusion from the individual voir dire sessions. (ECF No. 11-9, PageID # 8170-79, 8193). Dr. Lazzerini's counsel also moved for a mistrial, again arguing that Dr. Lazzerini had a constitutional right to be present. *Id*. The trial court again overruled the objection and denied the motion for a mistrial. *Id*. at PageID # 8189-93.

The court and the parties conducted additional individual voir dire on the second day of jury selection for approximately an hour and fifteen minutes, meaning the individual sessions lasted for nearly four hours. *Id*. at PageID # 8194-8267. Following the individual voir dire, a general voir dire of all potential jurors was conducted in open court and with Dr. Lazzerini present in a session lasting approximately three hours. *Id*. at PageID # 8285-8450. Of the jurors who underwent individual voir dire, eight were empaneled as jurors, including two alternates. In total, more than 50 jurors were questioned during individual voir dire proceedings.[1]

On June 19, 2019, the jury convicted Dr. Lazzerini on 187 counts, including engaging in a pattern of corrupt activity; involuntary manslaughter; telecommunications fraud; grand

---

[1] Dr. Lazzerini asserts that 53 jurors went through individual voir dire. The Fifth Appellate District stated that 56 jurors did so. (ECF No. 11-1, Exhibit 36, ¶ 14). Using either number, a significant portion of the jury pool underwent individual voir dire outside of Dr. Lazzerini's presence.

theft; tampering with records; trafficking in drugs; aggravated trafficking in drugs; and illegal

processing of drug documents, along with major drug offender specifications accompanying

eight counts of aggravated trafficking in drugs. (ECF No. 11-1, Exhibit 29). The jury acquitted

Dr. Lazzerini on the remaining 76 counts. *Id*. On July 12, 2019, the trial court sentenced Dr.

Lazzerini to a total of 113 years in prison. (ECF No. 11-1, Exhibit 31).

### B.  **Direct Appeal**

On September 17, 2019, Dr. Lazzerini, through counsel, timely filed a notice of appeal

to the Fifth Appellate District. (ECF No. 11-1, Exhibit 32). On September 24, 2020, Dr.

Lazzerini filed his appellate brief, raising the following assignments of error:

1.  The trial court erred in excluding appellant from the individual voir dire of fifty-six potential jurors, contrary to Criminal Rule 24, Criminal Rule 43, and his rights under the Ohio and United States Constitutions.

2.  The trial court erred in permitting the state of Ohio to introduce irrelevant evidence thereby prejudicing appellant's right to a fair trial.

3.  The trial court erred in sentencing appellant.

4.  The guilty verdicts in Counts 6-272 are inconsistent, unsupported by the evidence, and contrary to law.

5.  The trial court erred in its instructions to the jury.

6.  The trial court erred in denying appellant's motion to suppress the evidence obtained by executing search warrants at his home and business without permitting him to challenge the search warrant affidavit by way of a *Franks* hearing.

7.  Appellant was deprived of the right to effective assistance of counsel guaranteed to him by both the Ohio and United States Constitutions.

(ECF No. 11-1, Exhibit 33).

On June 11, 2021, the Fifth Appellate District affirmed Dr. Lazzerini's convictions

and sentence. (ECF No. 11-1, Exhibit 36). On July 26, 2021, Dr. Lazzerini, through counsel,

timely filed a notice of appeal to the Ohio Supreme Court. (ECF No. 11-1, Exhibit 37). In his

memorandum in support of jurisdiction, Dr. Lazzerini raised the following propositions of

law:

1. A criminal defendant's Due Process rights under the Ohio and United States Constitutions are violated when the defendant is denied the right to be present and meaningfully participate in critical portions of voir dire and that violation is structural error and reversable error per se.

2. A defendant is deprived of the right to a fair trial under the Ohio and United States Constitutions when the government is permitted to introduce cumulative, prejudicial, and irrelevant evidence.

3. A defendant is entitled to a new trial where his conviction was based on insufficient evidence on each element of the charges in violation of the Due Process Clause of the United States Constitution.

4. A defendant is deprived of the constitutional right to effective assistance of counsel where trial counsel fails to move for separate trials on substantially different issues and fails to object to prejudicial jury instructions.

5. It is a violation of the Fourteenth Amendment's Due Process Clause and the Eighth Amendment to the United States Constitution when a defendant is punished for exercising his right to trial and where a defendant receives a sentence that is grossly disproportionate to the convicted crimes.

(ECF No. 11-1, Exhibit 38). On September 28, 2021, the Ohio Supreme Court

declined to accept jurisdiction of the appeal. (ECF No. 11-1, Exhibit 44; *State v. Lazzerini*,

164 Ohio St. 3d 1448 (Sept. 28, 2021)). Four of the seven justices dissented. Three justices

would have accepted Dr. Lazzerini's appeal with respect to his first proposition of law that

his exclusion from portions of the voir dire violated his due process rights. *Lazzerini*, 164

Ohio St. 3d 1448.  One justice each would have accepted the appeal with respect to his second,

third, fourth, and fifth propositions of law. *Id*.

On October 8, 2021, Dr. Lazzerini, through counsel, filed a motion for

reconsideration, asking the court to reconsider its denial of jurisdiction over his voir dire

claim. (ECF No. 11-1, Exhibit 45). On December 22, 2021, the Ohio Supreme Court denied

Dr. Lazzerini's motion. (ECF No. 11-1, Exhibit 47).

Dr. Lazzerini, through counsel, timely filed a petition for a writ of certiorari in the United States Supreme Court. (ECF No. 11-1, Exhibit 51). In his petition, Dr. Lazzerini presented the following questions:

1. Is the exclusion of a criminal defendant from individual *voir dire* proceedings, in violation of his constitutional right to be present at all critical stages of his trial, a structural error which requires automatic reversal?

2. If the exclusion of a criminal defendant from individual *voir dire* proceedings is not a structural error, how should the harmless error standard be applied in this context and was the error harmless in this case?

On May 2, 2022, the Supreme Court denied Dr. Lazzerini's petition. (ECF No. 11-1, Exhibit 54).

### C. **Federal Habeas Action**

On August 18, 2022, Dr. Lazzerini, through counsel, filed his 28 U.S.C. § 2254 habeas petition. (ECF No. 1). Dr. Lazzerini's habeas petition raises four grounds for relief:

1. Petitioner was denied his constitutional right to be present at every critical stage of his trial when he was excluded from individual voir dire proceedings.

2. Petitioner was denied his constitutional right to effective assistance of counsel because his attorneys failed to object to prejudicial jury instructions.

3. Petitioner was denied his constitutional right to due process of law because the evidence was insufficient to support petitioner's convictions beyond a reasonable doubt.

4. Petitioner's sentence of 113 years imprisonment constitutes cruel and unusual punishment.

*Id*. The Warden filed an answer/return of writ on December 5, 2022. (ECF No. 11). Dr. Lazzerini filed his traverse on March 1, 2023. (ECF No. 16).

## IV. STANDARDS OF REVIEW AND GOVERNING LAW

### A. **Jurisdiction**

28 U.S.C. § 2254(a) authorizes this court to entertain an application for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court

only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him[.]" 28 U.S.C. § 2241(d). The Stark County Court of Common Pleas sentenced Dr. Lazzerini, and the Court takes judicial notice that Stark County is within this Court's geographic jurisdiction. Accordingly, this Court has jurisdiction over Dr. Lazzerini's § 2254 petition.

### B.  Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court can review a petition for a writ of habeas corpus on the merits. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the

petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806. In determining whether there has been a procedural default, the federal court looks to the last explained state-court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). A claim is fairly presented when it has been asserted as a federal constitutional issue at every stage of the state court review process. *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010); *Williams*, 460 F.3d at 806.

The Sixth Circuit has developed a four-part test to determine whether a procedural default precludes a federal court from reaching a petitioner's claim: (1) whether there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with; (2) whether the state court "actually enforced" the state procedural rule; (3) whether the rule is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the procedural rule and actual prejudice from the alleged constitutional error. *Barton v. Warden, Southern Ohio Corr. Facility*, 786 F.3d 450, 464 (6th Cir. 2015) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). These factors are commonly known as the "*Maupin*" factors.

As the fourth *Maupin* factor indicates, if a procedural default has occurred, the default can be excused and will not preclude consideration of a claim on federal habeas review if the petitioner can demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law;" or (2) "failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A

10

"fundamental miscarriage of justice" can occur only when the procedurally defaulted claim – supported by new reliable evidence not presented at trial – would establish that the petitioner was "actually innocent" of the offense. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

### C.  Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Glaze v. Morgan,* No. 1:19-CV-02974, 2022 WL 467980, at *4 (N.D. Ohio Jan. 18, 2022) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991)). Thus, "errors in application of state law . . . are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").

A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quotation omitted). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).

### D.  AEDPA Standard of Review

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act,

Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(*Id.*)

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet . . . because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents" and "goes no further."

13

*Id.* Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## V. ANALYSIS

### A. <u>Ground One: Exclusion from Voir Dire</u>

Dr. Lazzerini first argues that the trial court violated his due process rights when the court excluded him from the individual voir dire of more than 50 jurors.

"[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." *Rushen v. Spain*, 464 U.S. 114, 117 (1983). The right to be present is derived from the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985). A defendant has a right to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Commonwealth of Massachusetts*, 291 U.S. 97, 105-06 (1934). However, a defendant has no right to be present "when presence would be useless, or the benefit but a shadow." *Id.* at 106-07.

The Supreme Court has recognized that voir dire is a critical stage of a criminal trial. As the Court stated in *Snyder*, "defense may be made easier if the accused is permitted to be present at the examination of jurors . . . for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself." 291 U.S. at 106. Indeed, "[j]ury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873

14

(1989) (quotations omitted).

The Fifth Appellate District—the highest state court to address the issue on the merits—held that the trial court erred in excluding Dr. Lazzerini from the individual voir dire sessions, but found that the error was harmless. (ECF No. 11-1, Exhibit 36, ¶ 20). The Warden likewise does not argue in this proceeding that it was proper for the trial court to exclude Dr. Lazzerini. I will therefore proceed to considering whether the error was harmless.

A defendant's right to be present at all critical stages of a trial is "subject to harmless-error analysis." *Rushen*, 464 U.S. at 119 n.2. "The test for whether a federal constitutional error was harmless depends on the procedural posture of the case." *Davis v. Ayala*, 576 U.S. 257, 267 (2015). On direct appeal, before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

"In a collateral proceeding, the test is different." *Davis*, 576 U.S. at 267. "State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman*, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error." *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993). Thus, "[f]or reasons of finality, comity, and federalism, habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis*, 576 U.S. at 267 (citing *Brecht*, 507 U.S. at 637). Actual prejudice exists where the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's

verdict,' that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "Grave doubt means that 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *England v. Hart*, 970 F.3d 698, 714 (6th Cir. 2020) (quoting *McAninch*, 513 U.S. at 435). The Supreme Court has "instructed federal courts 'to ask directly, "do I, the judge, think that the error substantially influenced the jury's decision?'" *Id*. at 713-14 (quoting *McAninch*, 513 U.S. at 436).

Importantly, "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." *Brown v. Davenport*, 596 U.S. 118, 127 (2022). Thus, AEDPA deference applies to a state court's determination that a violation of federal law was harmless. *See Davis*, 576 U.S. at 269 ("a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable") (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). I must therefore "determine whether the state court's application of the harmless error analysis in this particular case is contrary to clearly established Supreme Court precedent or is an unreasonable application of that precedent." *Bell v. Hurley*, 97 F. App'x 11, 16 (6th Cir. 2004).

In *Davenport*, the Court also held that "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA." 596 U.S. at 122. "[S]atisfying *Brecht* is only a necessary, not a sufficient, condition to relief." *Id*. at 127. "[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [the Supreme] Court's equitable precedents or AEDPA," but "to *grant* relief, a court must find that the petitioner has cleared both tests." *Id*. at 134. "In sum, where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only

16

whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Id*. at 136.

### 1. *Dr. Lazzerini's Preliminary Arguments*

Before addressing whether the error here was harmless under *Brecht* and AEDPA, I must first address Dr. Lazzerini's arguments that the analysis is unnecessary. He first argues that I need not consider whether the error substantially influenced the jury's verdict because this case falls within the scope of footnote nine of *Brecht*, which states that the Court's opinion "does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht*, 507 U.S. at 638 n.9. Dr. Lazzerini cites several out-of-circuit decisions for the proposition that so-called "hybrid" errors falling within the scope of footnote nine defy harmless error analysis and mandate reversal.

However, while *Brecht* suggests that a particularly egregious error may not be subject to harmless error analysis, Dr. Lazzerini has not demonstrated that the trial court's error here rises to that level. He does not allege that this case involved a pattern of prosecutorial misconduct. And, as discussed below, courts have routinely applied a harmless error analysis to a defendant's exclusion from voir dire proceedings. Indeed, the Sixth Circuit has expressly held that "the right to be present at voir dire is not one of those structural rights whose violation constitutes per se error." *United States v. Riddle*, 249 F.3d 529, 535 (6th Cir. 2001). Dr. Lazzerini's claim is therefore subject to a harmless error analysis.

Dr. Lazzerini also argues that AEDPA does not apply—and that he must only satisfy *Brecht*—because the Fifth Appellate District did not correctly apply *Chapman* when

conducting its harmless error analysis. Dr. Lazzerini argues that the Fifth Appellate District did not cite *Chapman* and instead placed the burden on him to demonstrate that the error had an impact on the jury's verdict.

It is true that "if a state court has not adjudicated the petitioner's claim on the merits, AEDPA falls away." *Davenport*, 596 U.S. at 138. However, the Fifth Appellate District *did* adjudicate the harmless error issue on the merits, expressly holding that the error was harmless. (ECF No. 11-1, Exhibit 36, ¶ 20). *Davenport* did not hold that AEDPA deference applies only where the state court correctly applies *Chapman*. Rather, *Davenport* held that AEDPA does not apply if the state court "has not adjudicated the petitioner's claim on the merits." 596 U.S. at 139. To the extent Dr. Lazzerini believes the Fifth Appellate District misapplied *Chapman*, that goes to whether the court's decision was contrary to or an unreasonable application of governing law, not whether AEDPA applies in the first place.

Regardless, Dr. Lazzerini's assertion that the Fifth Appellate District failed to apply *Chapman* is wrong as a factual matter. In conducting its harmless error analysis, the Fifth Appellate District cited *State v. Williams*, 6 Ohio St. 3d 281 (1983). (ECF No. 11-1, Exhibit 36, ¶ 18), And *Williams*, in turn, expressly applied *Chapman*'s harmless error standard. 6 Ohio St. 3d at 286 ("In order to be deemed nonprejudicial, error of constitutional stature, either state or federal, must be 'harmless beyond a reasonable doubt.'") (quoting *Chapman*, 386 U.S. at 24)). I will therefore analyze Dr. Lazzerini's claim under both *Brecht* and AEDPA.

### 2. *Brecht*

As noted above, *Brecht* requires me to determine whether I, as the reviewing judge, have grave doubts about whether the error was harmless. After careful consideration, I have grave doubts and conclude that Dr. Lazzerini has satisfied *Brecht*.

As an initial matter, it is worth emphasizing the scope of the proceedings that Dr. Lazzerini was excluded from, which including the individual questioning of more than 50 separate jurors. As Dr. Lazzerini also correctly argues, the individual questioning of those jurors took up a majority of the overall voir dire questioning. And, as Dr. Lazzerini notes, eight of the jurors who were subject to individual voir dire were ultimately empaneled as either jurors or alternates. This is thus not a case where a defendant was excluded from a brief portion of the voir dire or a case where a few questions were asked during a sidebar conference. Instead, Dr. Lazzerini was systematically excluded from approximately four hours of voir dire proceedings that he had a constitutional right to attend.

Dr. Lazzerini has also made a persuasive showing that matters of substance were discussed during the voir dire process for which his presence would have been meaningful. Indeed, Dr. Lazzerini has identified a number of jurors who were questioned on substantive issues regarding their views on opioids and overprescription, whether opioids have had an impact on their lives, and their predispositions regarding the charges against Dr. Lazzerini. As examples of those exchanges:

- Juror Number 519 stated that she had personal experience with opioids. (ECF No. 11-8, PageID # 8101). She further stated that, in her view, the blame for problems with opioids usually falls on the individual taking it, but that every case is different. *Id*. Juror Number 519 was excused for cause on the motion of Dr. Lazzerini's counsel. *Id* at PageID # 8105. Dr. Lazzerini argues that, if he were present, he could have provided input regarding whether Juror Number 519 would be favorable to him given her view that the responsibility for opioid problems often lies with the patient.

- Juror Number 566 stated that opioids were a "big problem" in Ohio. (ECF No. 11-9, PageID # 8199-8200). He stated that he was a foster parent and that children had come into his care due to opioids. *Id*. at PageID # 8200. When asked if he could be fair and impartial, Juror Number 566 stated that it was hard not to be swayed by his experiences. *Id*. Juror Number 566 also stated that he believed doctors were trying to stop the pain patients were in, but that the situation was

"like a bartender who gets charged for a guy who can't handle his liquor and then goes around and wraps his car around a tree." *Id*. at PageID # 8206. He stated that a bartender could not see every single thing that happens in a bar full of 45 people. *Id*. However, he also expressed concern about the number of counts Dr. Lazzerini was facing. *Id*. at PageID # 8208-09. Following the questioning, the trial court asked Dr. Lazzerini's counsel, "[a]re you okay excusing this juror? I mean he was really good for you there for a minute." *Id*. at PageID # 8217. The record reflects that, after the exchange, Dr. Lazzerini's counsel consulted with Dr. Lazzerini. *Id*. Juror Number 566 was removed for cause, although, as Dr. Lazzerini notes, it is unclear who made the motion. *Id*. at PageID # 8231. Dr. Lazzerini asserts that it was important for him to hear the answers of such a conflicted juror in person to determine whether he wanted Juror Number 566 on the jury.

- Juror Number 409 stated that his grandson went to prison for drug issues after faking his symptoms to a doctor. (ECF No. 11-8, PageID # 8032). He also stated that he did not think his grandson's experience would prevent him from being impartial because "[k]id going to do drugs, they're going to do drugs." *Id*. Dr. Lazzerini's counsel did not move to exclude Juror Number 409, and Juror Number 409 ultimately served on the jury. Dr. Lazzerini asserts that he was wrongly prevented from hearing Juror Number 409's statements regarding the juror's grandson.

- Juror Number 464 stated that his father-in-law said he took opioid medication for chronic back pain, but that Juror Number 464 always doubted what his father-in-law told him. (ECF No. 11-8, PageID # 8075-76). He also stated, however, that his father-in-law's opioid usage did not impact his views on the case. *Id*. at PageID # 8076. Juror Number 464 further stated that he previously served on a grand jury and that he recognized the prosecutor from his grand jury service. *Id*. at PageID # 8077. However, he stated that his prior experience with the prosecutor would not impact his view on the case. *Id*. at PageID # 8078. Juror Number 464 was ultimately seated on the jury. Dr. Lazzerini assets that he should have been in attendance to hear Juror Number 464's statements about his father-in-law and prior grand jury service involving the same prosecutor.

- Juror Number 525 stated that she did not blame doctors for the opioid epidemic because she believed people were getting themselves addicted too easily. (ECF No. 11-8, PageID # 8136). She also stated that she currently believed Dr. Lazzerini was guilty but that she did not know for sure. *Id*. at PageID # 8137. However, she further stated that she believed it was unfair to decide if someone was guilty or innocent without hearing the evidence. *Id*. Dr. Lazzerini's counsel moved to remove Juror Number 525 for cause, which the trial court denied. *Id*.

at PageID # 8138. Dr. Lazzerini concedes that Juror Number 525 ultimately was not selected for the jury.

- Juror Number 523 stated that he was a teacher and that he had witnessed problems with prescription bills in that role. (ECF No. 11-8, PageID # 8113). Juror Number 523 also state that he "want[ed] to say that I can be completely impartial because that's what I would preach to my students but I'm human." *Id*. Juror Number 523 also expressed concern about the number of counts that Dr. Lazzerini was facing and said that his "kids are getting this from somewhere." *Id*. at PageID # 8114.

- Juror Number 437 was a licensed practical nurse. (ECF No. 11-8, PageID # 8050). She expressed the view that it has become very difficult for doctors to prescribe opioids to patients who need them because some people had abused the system. *Id*. She also stated that she had lost her brother, who had problems with drugs. *Id*. at PageID # 8051-52. She further stated that she dispenses medication as part of her job and that she knows how tight the controls are on prescriptions. *Id*. at PageID # 8053. In response to a question from Dr. Lazzerini's counsel, she said that she did not think she would be a good juror for Dr. Lazzerini because she was trained as a nurse to do no wrong. *Id*. at PageID # 8054. Juror Number 437 was removed for cause following a motion by Dr. Lazzerini's counsel. *Id*. at PageID # 8055 He now asserts that, had he been present, he may have wanted her on the jury given her familiarity with medical records and knowledge of the relevant regulations.

As this summary makes clear, the individual voir dire sessions did not deal merely with jurors' scheduling conflicts or other non-substantive issues. Instead, the court and the parties examined a number of jurors on topics that went directly to their views on the merits of the case, their impartiality, and their general views on the opioid epidemic. The questioning of Juror Number 566, who gave equivocal and arguably contradictory answers before being excused for cause after Dr. Lazzerini's counsel left the room to consult with Dr. Lazzerini, illustrates the problem with excluding him from the individual voir dire sessions. It is difficult for me to believe that Dr. Lazzerini's ability to assist in his own defense would not have been aided by hearing the jurors' answers in person. As the reviewing judge, I thus personally have grave doubts that the error in excluding Dr. Lazzerini from the individual voir dire sessions

was harmless. I therefore recommend that the Court hold that Dr. Lazzerini has satisfied *Brecht*.

### 3. *AEDPA*

As noted above, however, my conclusion that Dr. Lazzerini has satisfied *Brecht* does not end the inquiry, as he must also show under AEDPA that *every* fairminded jurist would agree that the error was harmful. And despite my own views regarding the harmlessness of the error, I am compelled to conclude that reasonable jurists could disagree on the issue and that Dr. Lazzerini has not met AEDPA's exacting standard.

In holding that the trial court's error was harmless, the Fifth Appellate District stated as follows:

> {¶20} While we find the trial court erred in excluding Appellant from the deliberation room during the individual voir dire of some of the jurors, we find any error was harmless. As in *Williams*, counsel for Appellant was present and actively participated in the individual voir dire. On the morning of the first day of jury selection, the jurors were given a questionnaire to complete. The trial judge then gave the parties between 2 ½ and 3 hours to review the answers. Presumably, Appellant was able to participate with his attorneys in the review of these answers.

> {¶21} When court resumed in the afternoon, the voir dire of jurors whose answers raised questions best inquired about in private began. Appellant was excluded from this procedure. When he renewed his objection the next morning before questioning began again, the trial court noted counsel had never asked to confer with Appellant during this process. Tr. II (26-27). When voir dire in the deliberation room resumed, the record reflects counsel did on one occasion ask for permission to confer with Appellant, and such permission was granted.

> {¶22} Following the examination of jurors in the deliberation room, general voir dire continued in the courtroom. Appellant was present for this portion of the proceeding. All peremptory challenges were executed during this portion of the voir dire.

> {¶23} Appellant argues he had unique knowledge of the "prescriptive practice" of opioids. However, we have reviewed the transcript of the voir dire of jurors conducted outside his presence, and nothing in the questioning of the jurors during this time reflects a need for such expertise. Many of the questions dealt with non-medical concerns of jurors, such as not being paid by their employers for service during the lengthy trial, planned vacations, family illness, and newspaper coverage of the trial. While some jurors had concerns with the over-prescription of opioids in general, there

22

was nothing in the questioning which would reflect a need of or benefit from medical expertise. Of the 23 jurors excused for cause during the proceeding in the deliberation room, the record demonstrates either they were dismissed on Appellant's motion or with Appellant's agreement to the dismissal for cause. Further, the questioning outside Appellant's presence was limited to a handful of answers on the questionnaire; all other voir dire of jurors took place in Appellant's presence.

{¶24} Appellant points to no specific juror or line of questioning in the proceedings for whom his presence might have made a difference as to the final composition of the jury. Finally, we note the jury as ultimately constituted found Appellant not guilty of approximately one-third of the charges. For these reasons, we find the error in excluding Appellant from a portion of the voir dire in the instant case was harmless.

(ECF No. 11-1, Exhibit 36).

Under AEDPA, Dr. Lazzerini must show that the Fifth Appellate District's analysis was contrary to or a misapplication of controlling law. Dr. Lazzerini argues that the Fifth Appellate District's analysis was contrary to *Crawford* because it improperly put the burden on him to prove that the error was not harmless. I disagree. As noted above, the Fifth Appellate District cited to *Williams*, which itself relief on *Crawford* and held that it is the State's burden to prove that the error was harmless beyond a reasonable doubt. While the Fifth Appellate District did say that Dr. Lazzerini "points to no specific juror or line of questioning," that statement came at the end of a broader discussion in which the Fifth Appellate District explained the affirmative reasons it believed the error was harmless. I am not prepared to conclude that the Fifth Appellate District's ambiguous statement, standing alone, demonstrates that it improperly placed the burden on him to show that the error was harmful.

Dr. Lazzerini also cannot show that the Fifth Appellate District misapplied *Crawford*, as fairminded jurists could agree with the Fifth Appellate District's holding that the trial court's error in excluding Dr. Lazzerini from the individual voir dire sessions was harmless. As the Fifth Appellate District noted, Dr. Lazzerini was able to consult with his counsel

23

regarding the jurors' answers to the questionnaires, and was also able to attend the general voir dire session, during which peremptory challenges were exercised. The record also indicates that, on at least one occasion, Dr. Lazzerini's counsel was able to step out and consult with him regarding a juror's answers while the individual voir dire sessions were ongoing.

Federal courts have found that the exclusion of a defendant from voir dire proceedings was harmless in similar circumstances. *See Bland v. Sirmons*, 459 F.3d 999, 1021 (10th Cir. 2006) (holding that any error in excluding defendant from individual voir dire of 32 jurors was harmless as that alleged inability to observe potential jurors and challenge them on basis of sudden impressions or personal knowledge was "not enough to establish a constitutional violation"); *Lockett v. Trammell*, 711 F.3d 1218, 1250-51 (10th Cir. 2013) (holding that error was harmless even though defendant had been absent for individual voir dire of 19 jurors where defendant was present for majority of voir dire and defendant did not offer explanation of why his presence was necessary); *Buie v. Rivard*, No. 2:14-CV11100, 2016 WL 2866401, at *13 (E.D. Mich. May 17, 2016) (holding that petitioner failed to establish prejudice from exclusion of portion of voir dire where "[d]efense counsel was present to protect his interests" and there was "significant evidence of guilt presented at trial"); *Wilder v. United States*, 806 F.3d 653, 659 (1st Cir. 2015) ("While Wilder argues that his presence would have affected the outcome because he would have asked certain jurors follow-up questions, requested more definite answers, or made additional for-cause challenges, it requires too much speculation to say that the outcome would have been different."). Thus, it is not the case that all fairminded jurists would disagree with the Fifth Appellate District's holding that the trial court's error was harmless.

Dr. Lazzerini's counterarguments are not without some force. As he notes, even if he was permitted to consult with his counsel regarding the answers jurors gave during the individual voir dire sessions, there was potential value in Dr. Lazzerini being able to witness those answers in person to gauge the demeanor of the potential jurors and to suggest follow-up questions where appropriate. It is also arguable that the Fifth Appellate District accorded insufficient weight to the length and breadth of the questioning that Dr. Lazzerini was excluded from.

I also have concerns about the Fifth Appellate District's characterization of what occurred during the individual voir dire. Indeed, as the summary above indicates, there is serious reason to dispute the Fifth Appellate District's findings that the questioning outside Dr. Lazzerini's presence "was limited to a handful of answers on the questionnaire,"; largely dealt with "non-medical concerns of jurors," and that there was "nothing in the questioning which would reflect a need or benefit from medical expertise." Reasonable minds could easily conclude that the individual voir dire sessions dealt heavily with substantive matters for which Dr. Lazzerini's presence would have been beneficial.

If I were conducting a de novo review, I may very well reach a different conclusion. I am mindful, however, that I am *not* conducting a de novo review of the state courts' factual findings. Rather, the Fifth Appellate District's determination is not unreasonable simply because I would have reached a different conclusion in the first instance. *Wood*, 558 U.S. at 301. Dr. Lazzerini must instead rebut the state court's characterization of the individual voir dire sessions "by clear and convincing evidence." *Burt*, 571 U.S. at 18. While I believe this is a close question, I conclude that he has not done so here. Instead, this is a case where "[r]easonable minds reviewing the record might disagree" about whether the Fifth Appellate

District's characterization constituted a clear factual error that is subject to being overturned under AEDPA.

In sum, following *Davenport*, it is simply not enough that I have grave doubts about the Fifth Appellate District's reasoning. Rather, Dr. Lazzerini must show that *all* fairminded jurists would find that the error was harmful. While I am troubled by Dr. Lazzerini's exclusion from the individual voir dire, he has not cleared that extraordinarily high bar. I therefore recommend that the Court deny Dr. Lazzerini's first ground for relief. However, as discussed below, because I believe Dr. Lazzerini has made a substantial showing that his constitutional rights may have been violated, I also recommend that the Court grant Dr. Lazzerini a certificate of appealability with respect to his first ground for relief.

### B. Ground Two: Ineffective Assistance of Counsel

In his second ground for relief, Dr. Lazzerini asserts that he received ineffective assistance of trial counsel under the Sixth and Fourteenth Amendments. He argues that his counsel was ineffective because counsel did not object to jury instructions that failed to inform the jury that it could convict him of drug trafficking and falsification of drug documents only if the State proved beyond a reasonable doubt that Dr. Lazzerini violated specific statutes or regulatory provisions regarding the provision of medicine. The Warden responds that Dr. Lazzerini procedurally defaulted on his ineffective assistance of counsel claim because he did not fairly present it to the Ohio courts, and also argues that the claim fails on the merits. Because I agree with the Warden that Dr. Lazzerini committed a procedural default and has not demonstrated grounds to excuse the default, I do not reach the merits of the claim.

"[F]ederal courts ordinarily may not 'consider a claim in a *habeas* petition that was not "fairly presented" to the state courts' absent cause and prejudice to excuse the procedural

default." *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 751 (6th Cir. 2021) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). "[I]t does not suffice to only present the claim to a state trial court; rather, the petitioner must raise the claim in state court and 'pursue [it] through the state's ordinary appellate review procedures." *Id.* at 751-52 (quoting *Thompson v. Bell*, 580 F.3d 423, 437 (6th Cir. 2009)).

"To determine whether a petitioner has fairly presented a claim in state court, [a court] ask[s] whether the petitioner: (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law." *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017). "While a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (quoting *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004)).

The Warden argues that Dr. Lazzerini procedurally defaulted on his ineffective assistance claim because he pursued a different legal theory during the state court proceedings than he is pursuing in his habeas petition. The Warden is correct that, in the habeas context, "[e]ven the same claim, if raised on different grounds, is not exhausted for the purpose of federal habeas review." *Rayner v. Mills*, 685 F.3d 631, 643 (6th Cir. 2012); *see also Pilette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987) ("The doctrine of exhaustion requires that the same claim under the same theory be presented to state courts before raising it in a habeas

petition.").[2] "Relatedness of the issues . . . does not save [a petitioner's] claim." *Lott v. Coyle*, 261 F.3d 594, 607 (2001).

"Determining when a claim has been 'fairly presented' is contextual and individual to each case." *Houston v. Waller*, 420 F. App'x 501, 509 (6th Cir. 2011). In some instances, simply presenting the facts, without also presenting 'the constitutional claim . . . inherent in those facts' is insufficient." *Waller*, 420 F. App'x at 509 (quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971)). "In others, however, 'the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support.'" *Id.* at 509-10 (quoting *Picard*, 404 U.S. at 278).

While Dr. Lazzerini raised an ineffective assistance of counsel argument on direct appeal based on his counsel's failure to object to allegedly fault jury instructions, the Warden argues that he did so based on a different theory than the one he is pursuing here. As the Warden notes, Dr. Lazzerini asserted in his appeals to the Fifth Appellate District and the Ohio Supreme Court that the jury instructions were erroneous—and that his counsel should have objected—to the extent the court instructed the jury that it must find Dr. Lazzerini trafficked drugs for "[o]ther than legitimate medical purposes and inconsistent with the usual course of medical practice and treatment of patients under the laws regulating a physician's practice." (ECF No. 11-1, Exhibit 33). Dr. Lazzerini argued that the trial court failed to adequately define the terms "legitimate medical purpose" and "usual course of medical practice and treatment of patients under the laws regulating a physician's practice." *Id.* at

---

[2] Dr. Lazzerini cites *Hemphill v. New York*, 595 U.S. 140 (2022), for the proposition that, while a petitioner must fairly present a claim to the state courts, "no particular form of words or phrases is essential for satisfying the presentation requirement, so long as the claim is brought to the attention of the state court with fair precision and in due time." *Id.* at 148 (quoting *Street v. New York*, 394 U.S. 576, 584 (1969)) (cleaned up). The Court further held that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim." *Id.* at 149 (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992)). *Hemphill*, however, came to the Court on direct appeal, not by way of a habeas petition. *Id.* at 147-48.

28

PageID # 6902. Dr. Lazzerini also argued that it was "incumbent . . . upon the State to elicit expert testimony that, to a reasonable degree of medical certainty, Dr. Lazzerini's treatment of named patients was inconsistent with the usual course of medical practice, and the prescriptions were issued other than for a legitimate medical purpose." *Id*. Finally, Dr. Lazzerini argued that the trial court's definition of those terms was improperly placed in a glossary of terms without explaining to the jury how they should be applied. *Id*. at PageID # 6903.

Dr. Lazzerini's argument in his habeas petition is fundamentally different. While he challenges the same instructions, he now argues that his counsel should have objected because the trial court did not instruct the jury that the State must prove beyond a reasonable doubt that Dr. Lazzerini violated statutes or regulations governing the practice of medicine. He notes that both the Ohio drug trafficking and illegal processing of drug documents statutes contain exceptions for licensed health professionals. Those exceptions provide that the statutes do not apply to, among others, "licensed health professionals authorized to prescribe drugs . . . whose conduct is in accordance with" various statutes and regulations governing the provision of medical services. *See* R.C. 2925.03(B)(1); R.C. 2925.23(E). Dr. Lazzerini further notes that, in *State v. Nucklos*, 121 Ohio St. 3d 332 (2009), the Ohio Supreme Court held that "a licensed health professional's noncompliance with statutory or regulatory requirements is an element of trafficking in drugs that the state must prove beyond a reasonable doubt." *Id*. at 332. He argues that the trial court did not instruct the jury that it must find the State had proven the exception's inapplicability beyond a reasonable doubt and that his trial counsel was ineffective for failing to object to the instructions on that basis.

While both arguments are centered around counsel's failure to object to jury

instructions regarding whether Dr. Lazzerini was providing proper medical treatment, the two theories are entirely different. Because Dr. Lazzerini did not base his argument around the licensed health professional exception, the Fifth Appellate District did not discuss the exception's application to this case. Because the state courts "would not have been alerted" that Dr. Lazzerini was challenging the jury instruction or his counsel's effectiveness on that basis, he has therefore not fairly presented it. *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008); *see also Zich v. Haviland*, No. 3:18CV02515, 2020 WL 7684940, at *25 (N.D. Ohio Apr. 30, 2020), *report and recommendation adopted*, 2020 WL 7237289 (N.D. Ohio Dec. 9, 2020) ("to be fairly presented, an ineffective assistance of counsel claim on federal habeas review must rely on the same underlying reasons as was presented to the state courts") (citing *Pilette*, 824 F.2d at 497)).

I therefore conclude that Dr. Lazzerini failed to exhaust his ineffective assistance of counsel claim. And, because the time for him to do so has long since expired, he has procedurally defaulted on the claim. *See Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("if an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review").

Dr. Lazzerini's procedural default can be excused if he demonstrates either both cause and prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. However, Dr. Lazzerini does not argue that cause and prejudice exist to excuse the default and does not present new evidence unavailable at trial demonstrating that he actually innocent of the offenses. Instead, he argues only that he did not commit a procedural default in the first place. I disagree, and therefore recommend that the Court dismiss Dr. Lazzerini's second ground for relief as procedurally defaulted.

**C.  Ground Three: Sufficiency of the Evidence**

In his third ground for relief, Dr. Lazzerini argues that the evidence was insufficient to support his convictions for drug trafficking, aggravated drug trafficking, illegal processing of drug documents, and involuntary manslaughter. The Warden argues that Dr. Lazzerini has procedurally defaulted on his claim with respect to the drug trafficking and falsification of drug documents convictions to the extent Dr. Lazzerini bases his argument on the State's failure to disprove the applicability of the licensed health professional exception. The Warden also argues that Dr. Lazzerini's claim fails on the merits. I will address each argument in turn.

### *1.  Procedural Default*

The Warden initially argues that Dr. Lazzerini procedurally defaulted on his sufficiency of the evidence claim to the extent he is challenging his convictions for drug trafficking, aggravated drug trafficking, and illegal processing of drug documents because he failed to fairly present that portion of his claim to the Ohio courts during his direct appeal. The Warden concedes that Dr. Lazzerini raised a sufficiency of the evidence claim as a federal constitutional claim at all levels of the state court review process. The Warden argues, however, that Dr. Lazzerini pursued a different theory during the state court proceedings than he is now pursuing in his habeas petition.

As with his ineffective assistance of counsel claim, Dr. Lazzerini argues that the jury instructions were erroneous for the drug trafficking and illegal processing of drug documents charges because the jury was not instructed that the State must prove the inapplicability of the licensed health professional exemption beyond a reasonable doubt. As with his ineffective assistance of counsel claim, I agree with the Warden that Dr. Lazzerini did not pursue that theory during the state court proceedings. Instead, Dr. Lazzerini argued that the evidence was insufficient with respect to the drug trafficking and illegal processing of drug documents

31

charges because the jury had to review complicated medical records without sufficient guidance, because the jury rendered allegedly inconsistent verdicts, and because the State's expert did not provide expert testimony as to each count in the indictment. Dr. Lazzerini thus did not fairly present a claim that the evidence was insufficient because the State did not prove the inapplicability of the licensed health professional exemption, and I recommend that the Court dismiss Ground Three as procedurally defaulted to the extent it is based on that argument.

Dr. Lazzerini has also arguably procedurally defaulted his claim to the extent he argues that insufficient evidence existed to show that he wrote prescriptions without a legitimate medical purpose and outside of the usual course of medical care. However, in his brief to the Fifth Appellate District, he argued that the jury was left to render a verdict based on, among other things, "a confusing set of instructions" and that the State's expert did not provide expert testimony as to each count or prescription. (ECF No. 11-1, Exhibit 33, PageID # 6898). Dr. Lazzerini similarly argued to the Ohio Supreme Court that the testimony of the State's expert was insufficient to show that he wrote prescriptions in a manner inconsistent with the usual course of medical practice and not for a legitimate medical purpose. (ECF No. 11-1, Exhibit 38, PageID # 7126). Notably, the Fifth Appellate District expressly rejected Dr. Lazzerini's sufficiency of the evidence argument on the basis that the State's expert "explained how [Dr. Lazzerini]'s entire pattern of prescribing of controlled substances was done in a manner inconsistent with the usual course of medical practice and for other than a legitimate medical purpose." (ECF No. 11-1, Exhibit 36, ¶ 36).

Thus, while a close call, I conclude that he fairly presented a sufficiency of the evidence argument with respect to his convictions for drug trafficking, aggravated drug

trafficking, and illegal processing of drug documents based on the State's alleged failure to prove that he wrote prescriptions outside the usual course of medical practice and not for a legitimate medical purpose. Accordingly, I will analyze that portion of Dr. Lazzerini's argument on the merits, along with his challenge to the sufficiency of the evidence supporting his involuntary manslaughter conviction, which the Warden has not argued Dr. Lazzerini procedurally defaulted.

### 2. *Merits*

Challenges to a state court conviction based on the sufficiency of the evidence are properly cognizable in a federal habeas corpus petition. *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979). In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The reviewing court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Review of sufficiency of the evidence challenges involves "a double layer of deference[.]" *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). "First, [a court] must view the evidence in the light most favorable to the prosecution, and determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mathis v. Colson*, 528 F. App'x 470, 476 (6th Cir. 2013) (quoting *Jackson*, 443 U.S. at 319). "Second, 'even were [a court] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [a court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.'" *Id.* (quoting *Brown,* 567 F.3d at 205). Under the *Jackson* standard,

a habeas petitioner "who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

### a. *Drug Trafficking, Aggravated Drug Trafficking, and Illegal Processing of Drug Documents*

Dr. Lazzerini first argues that the evidence was insufficient to support his convictions for drug trafficking, aggravated drug trafficking, and illegal processing of drug documents because the State did not prove he wrote prescriptions inconsistent with the usual course of medical practice and not for a legitimate medical purpose. The Fifth Appellate District rejected Dr. Lazzerini's argument on the merits, holding as follows:

> {¶81} Appellant next argues the verdict is against the weight and sufficiency of the evidence because the jury had to review extensive "mind-numbing" patient medical records, expert reports, and jury instructions. However, this is no different than many other complicated jury trials, both criminal or civil. We find the mere fact the jury was faced with a difficult task in reviewing the records does not render the verdict against the weight or sufficiency of the evidence. The State and the trial court assisted the jury with explanations of the indictments, definitions of the drug charges and medical terminology, expert witness testimony to explain the medical records, and summaries of the evidence. We find the record does not demonstrate the jury lost its way in its consideration of the extensive medical evidence presented in the case.

> {¶82} Finally, Appellant argues the State failed to provide expert testimony concerning each count in the indictment or for each prescription. As discussed earlier in our discussion of the major drug offender specification, Appellant stipulated to the prescriptions given each patient. At page 36 of its brief, the State has cited to the places in the transcript where Dr. Parran testified concerning the course of treatment and the prescriptions given to each of the 42 patients named in the indictment. His extensive testimony as to each individual patient extends from page 170 of volume 8 of the transcript through volume 10, page 177 of the transcript. As to each and every patient, Dr. Parran explained how Appellant's entire pattern of prescribing of controlled substances was done in a manner inconsistent with the usual course of medical practice and for other than a legitimate medical purpose. We find the convictions of trafficking, aggravated trafficking and illegal processing of drug documents are not against the manifest weight or sufficiency of the evidence.

(ECF No. 11-1, Exhibit 36).

Applying the first layer of the "double layer of deference," *White*, 602 F.3d at 710, I

agree that a rational trier of fact could have found that Dr. Lazzerini committed the elements of drug trafficking, aggravated drug trafficking, and illegal processing of drug documents beyond a reasonable doubt given the evidence presented at trial, including the testimony of Dr. Parran that Dr. Lazzerini's prescription practices were inconsistent with the usual course of medical practice and not for a legitimate medical purpose.

And even if I had concluded (which I do not) that a rational trier of fact could not have found Dr. Lazzerini guilty beyond a reasonable doubt, on habeas review I must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. *White*, 602 F.3d at 710. Applying the second layer of the "double layer of deference," I do not find the state appellate court's sufficiency determination unreasonable for the reasons set forth above. I therefore recommend that the Court deny Dr. Lazzerini's third ground for relief with respect to the drug trafficking, aggravated drug trafficking, and illegal processing of drug documents convictions.

### b. *Involuntary Manslaughter*

Dr. Lazzerini also argues that the evidence was insufficient to convict him on the involuntary manslaughter charge because the State failed to prove that the victim's death was caused by Dr. Lazzerini's prescription practices rather than her underlying medical conditions. The Fifth Appellate District rejected Dr. Lazzerini's argument on the merits, holding as follows:

{¶83} **Involuntary Manslaughter:** Appellant argues there was insufficient evidence to demonstrate his prescriptions were the "but for" cause of the death of 38-year-old Jaimie Hayhurst. He argues she had other health conditions which could have caused or contributed to her death, and the State failed to present evidence her death was caused by drugs he prescribed.

{¶84} Appellant was convicted of involuntary manslaughter in the death of Hayhurst, as defined by R.C. 2903.04(A), which provides, "No person shall cause the death of

35

another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

{¶85} The coroner's report named the cause of death as "acute intoxication by the combined effects of multiple drugs, including Alprazolam, Fentanyl and Oxycodone." Dr. Parran testified Appellant continued to provide multiple dangerous prescriptions to Hayhurst, despite the fact she had been hospitalized with an accidental overdose and displayed multiple signs, including her in-office behavior, indicating her condition was deteriorating due to the drugs she was prescribed. Dr. Parran testified there was no legitimate medical purpose for the drugs Hayhurst was prescribed by Appellant.

{¶86} Dr. Frank Miller, the Chief Deputy Coroner of Lorain County, performed the autopsy on Hayhurst. He testified as follows regarding emphysema and other health conditions the victim was dealing with at the time of her death, and the specific circumstances in which her body was found:

> Q. So if she wouldn't have had all those drugs in her system, and still had all those things going on, laying facedown, that kind of thing, would she have died?
>
> A. Well, you know, she hadn't any of the days before that with all these diseases. But on this day, she has these drugs, we've measured these levels after she's been found and after she's been autopsied, and these are a major influence on breathing. And she has emphysema, she has a breathing disorder, sleep apnea probably based on her neck anatomy, and is facedown in a pillow which is not going to encourage external ability to exchange air. So I think all these things added together to cause her death.
>
> Q. I see. And what – did you do a cause of death; is that right?
>
> A. Yes.
>
> Q. What was that?
>
> A. The cause of death, it is acute intoxication by the combined effects of multiple drugs including alprazolam, fentanyl, and oxycodone. And the other significant condition contributing to death, but not a direct cause, is emphysema.
>
> Q. Okay. So emphysema didn't cause her death?
>
> A. No, it contributes – it's another respiratory problem she has and contributes to her death, but it is not the direct cause.
>
> Q. What – and the direct cause is the combined effects of multiple drugs?
>
> A. Yeah, the drug toxicity is the primary, immediate cause.

{¶87} Tr. (13) 151-153.

36

{¶88} The State also presented the testimony of Dr. Renee Robinson, a forensic pathologist, who conducted an independent review of the autopsy report, the autopsy photographs and microscopic slides, the medical records from area hospitals and Appellant's office, the coroner's investigative report, the reports from Appellant's expert witnesses, police reports, and EMS reports. Dr. Robinson concurred in Dr. Miller's assessment Hayhurst's death was drug-related, given she had no evidence in life or after death of any other natural process which would cause her death. Tr. (18) 95.

{¶89} The State presented expert testimony which, if believed by the jury, would support the jury's finding Appellant's prescription drugs were the "but for" cause of Jaimie's Hayhurst's death. We find the jury did not lose its way in believing this testimony, and the judgment convicting Appellant of involuntary manslaughter is therefore not against the manifest weight or sufficiency of the evidence.

(ECF No. 11-1, Exhibit 36).

Applying the first layer of the "double layer of deference," *White*, 602 F.3d at 710, I agree that a rational trier of fact could have found that Dr. Lazzerini committed the elements of involuntary manslaughter beyond a reasonable doubt, including the testimony of two expert witnesses that the drugs prescribed by Dr. Lazzerini were a but-for cause of the victim's death.

And even if I had concluded (which I do not) that a rational trier of fact could not have found Dr. Lazzerini guilty beyond a reasonable doubt, on habeas review I must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. *White*, 602 F.3d at 710. Applying the second layer of the "double layer of deference," I do not find the state appellate court's sufficiency determination unreasonable for the reasons set forth above. I therefore recommend that the Court deny Dr. Lazzerini's third ground for relief with respect to his involuntary manslaughter conviction.

**D.  Ground Four: Eighth Amendment**

In his fourth and final ground for relief, Dr. Lazzerini asserts that his sentence of 113 years violates the Eighth Amendment's prohibition on cruel and unusual punishment. Dr.

37

Lazzerini argues that his sentence is unconstitutional for two reasons: (1) the trial court vindictively imposed his sentence to punish him for rejecting the State's pre-trial plea offer; and (2) his sentence is grossly disproportionate to the offenses for which he was convicted.

The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. Amend. VIII. The Eighth Amendment is applicable to the states through the Fourteenth Amendment. *See Roper v. Simmons*, 543 U.S. 551, 560 (2005) (citing cases). It "guarantees individuals the right not to be subjected to excessive sanctions." *Id*. (citing *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)). That right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Id*. (quoting *Atkins*, 536 U.S. at 560); *see also Graham v. Florida*, 560 U.S. 48, 59 (2010) ("The concept of proportionality is central to the Eighth Amendment.").

Dr. Lazzerini first argues that his sentence is unconstitutional because the State previously offered him a plea deal of 27 years if he pled guilty to all 272 counts. He asserts that the trial court was motivated by vindictiveness and intended to punish him for rejecting the plea offer when it sentenced him to 113 years after he was acquitted of approximately one-third of the charges.

The Fifth Appellate District rejected Dr. Lazzerini's vindictiveness argument on the merits, holding as follows:

> **Vindictiveness:** Appellant argues his total sentence of 113 years incarceration was cruel and unusual, and demonstrated vindictiveness for exercising his right to a jury trial. He argues he was offered a sentence of 27 years before trial in exchange for a guilty plea.
>
> {¶66} "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort * * *." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), citing *North Carolina v. Pearce*, 395 U.S. 711, 738, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (Black, J.,

concurring in part and dissenting in part). A sentence vindictively imposed on a defendant for exercising his constitutional right to a jury trial is contrary to law. *See State v. O'Dell*, 45 Ohio St.3d 140, 147, 543 N.E.2d 1220 (1989). However, when a defendant receives a harsher sentence following his rejection of a plea offer, there is not a "reasonable likelihood" the sentence was based on actual vindictiveness, and the defendant must prove actual vindictiveness. *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 18.

{¶67} Appellant has cited to nothing in the record demonstrating the sentence was based on or influenced in any way by his rejection of a plea bargain and his decision to go to trial. We find Appellant has not affirmatively demonstrated the sentence was vindictive merely because it was greater than the plea offer made before trial.

(ECF No. 11-1, Exhibit 36).

The Fifth Appellate District did not act contrary to or misapply controlling law in rejecting Dr. Lazzerini's vindictiveness claim. To the contrary, the Supreme Court held in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), that the "unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction" is "'very different from the give-and-take negotiation common in plea bargaining between the prosecution and the defense, which arguably possess relatively equal bargaining power.'" *Id.* at 362 (quoting *Parker v. North Carolina*, 397 U.S. 790, 809 (1970)). The Court further held that "by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty." *Id.* at 364; *see also Fears v. Miller*, No. 1:09CV698, 2009 WL 6315341, at *10 (N.D. Ohio Dec. 1, 2009), *report and recommendation adopted*, 2010 WL 1258096 (N.D. Ohio Mar. 30, 2010) ("the mere imposition of a longer sentence than a defendant would have received had he pled guilty does not automatically constitute vindictive or retaliatory punishment"); *Reed v. Forshey*, No. 5:15CV331, 2016 WL 8674571, at *14 (N.D. Ohio Sept. 23, 2016), *report and recommendation adopted*, 2017 WL 242274 (N.D. Ohio Jan. 20, 2017) ("Petitioner was free

to accept or reject the prosecution's plea agreement. By rejecting it and proceeding to trial, he voluntarily and knowingly assumed the 'inevitable' and 'permissible' risk of a harsher punishment.") (quoting *Bordenkircher*, 434 U.S. at 364). Nor did the Fifth Appellate District err in concluding that Dr. Lazzerini failed to point to any evidence showing that the trial court was motivated by actual vindictiveness or actually intended to punish Dr. Lazzerini for rejecting the plea offer.

Dr. Lazzerini also is not entitled to habeas relief on the basis that his sentence is disproportionate to the crimes for which he was convicted. The Eighth Amendment does not contain a general "guarantee against disproportionate sentences." *Harmelin v. Michigan*, 501 U.S. 957, 985 (1991)). Rather, as the Supreme Court held in *Lockyer*, "[t]hrough [the] thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as 'clearly established' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." 538 U.S. at 72. Even with respect to the "gross disproportionality" principle, however, the "precise contours" are "unclear," and it is "applicable only in the 'exceedingly rare' and 'extreme' case." *Id*. at 73.

Here, Dr. Lazzerini was convicted on 187 counts, including charges of involuntary manslaughter, trafficking in drugs, illegal processing of drug documents, running a corrupt enterprise, telecommunications fraud, Medicaid fraud, tampering with records, and grand theft. Given the seriousness of the crimes and the number of counts on which he was convicted, Dr. Lazzerini has not shown that this is one of those exceedingly rare and extreme cases where a sentence for a term of years violates the Eighth Amendment. I therefore recommend that the Court deny Dr. Lazzerini's fourth ground for relief.

## VI. RECOMMENDATION REGARDING CERTIFICATE OF APPEALABILITY

### A. **Legal Standard**

As amended by AEDPA, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "[a] 'substantial showing' requires the applicant to 'demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)). The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." *Id.*; *see also* 28 U.S.C. § 2253(c)(3) ("The certificate of appealability under [§ 2253(c)(1)] shall indicate which specific issue or issues satisfy the showing required by [§ 2253(c)(2)]."). In light of the Rule 11 requirement that the court either grant or deny the certificate of appealability at the time

of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

**B. <u>Analysis</u>**

If the Court accepts my recommendations, Dr. Lazzerini will not be able to show that the Court's ruling on his second, third, and fourth grounds for relief is debatable among jurists of reason. With respect to ground one, however, I believe that jurists of reason could debate whether Dr. Lazzerini's constitutional rights were violated when he was excluded from the individual voir dire sessions of more than 50 jurors. I also believe jurists of reason could debate whether all fairminded jurors would agree that the constitutional error was harmless given the breadth of the proceedings that occurred outside of Dr. Lazzerini's presence, the substantive nature of those sessions, Dr. Lazzerini's plausible assertion that his presence would have assisted in his defense, and the fact that several members of the jury pool who went through individual voir dire ended up on the jury that convicted him. Accordingly, I recommend that Dr. Lazzerini be granted a certificate of appealability with respect to ground one, but not with respect to grounds two, three, and four.

**VII. RECOMMENDATION**

For the foregoing reasons, I RECOMMEND that the Court DISMISS and/or DENY Dr. Lazzerini's petition for a writ of habeas corpus under 28 U.S.C. § 2254. However, I also recommend that the Court grant him a certificate of appealability solely with respect to his first ground for relief.

Dated:  August 9, 2024                          */s/ Jennifer Dowdell Armstrong*
                                                Jennifer Dowdell Armstrong
                                                U.S. Magistrate Judge

**NOTICE TO PARTIES REGARDING OBJECTIONS**

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same

argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).